Irma Jean PEREZ, Plaintiff–Appellant,

v.

Wayne A. SIMMONS; James Nalls; Thomas Miller; Mark Meske; and City of Santa Barbara, Defendants–Appellees.

No. 86–6663.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 7, 1988.

Decided Oct. 26, 1988.

Amended Aug. 31, 1989.

John M. Sink, Santa Barbara, Cal., for plaintiff-appellant.

David K. Hughes, Asst. City Atty., and Kristofer Kallman, Santa Barbara, Cal., for defendants-appellees.

Before HUG, ALARCON and KOZINSKI, Circuit Judges.

HUG, Circuit Judge:

An opinion in this case was filed on October 26, 1988, *Perez v. Simmons*, 859 F.2d 1411 (9th Cir.1988). Appellees petitioned for a writ of certiorari to the United States Supreme Court. In response to the petition, the Court vacated the judgment and remanded to our court for further consideration in light of *City of Canton v. Harris*, — U.S. —, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). *Simmons v. Perez*, — U.S. —, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989). On further consideration, in light of that case, we file this amended opinion.

Plaintiff Irma Perez brought this section 1983 action against the City of Santa Barbara and certain police officers alleging that the officers violated her constitutional rights by entering her house unlawfully in search of her brother. The district judge granted a directed verdict in favor of the City, and a jury found in favor of the remaining defendants. In this appeal, Perez alleges error in the jury instructions and error in granting the directed verdict. We have jurisdiction under 28 U.S.C. § 1291 (1982). We reverse.

## I.

## FACTS

On March 8, 1983, Irma Perez was living in a three-bedroom apartment at 13 South Soledad Street, in Santa Barbara, California. She had lived there over three years with her children.

Irma Perez had a brother named Albert who, Irma testified, never lived in her apartment. Albert was on probation and also had warrants outstanding for his arrest. Officers Nalls, Simmons, and Miller of the Santa Barbara Police Department narcotics detail were aware of the arrest warrants. Between October and December of 1982, the officers went three or four times to the residence of Albert's other sister, Debbie, to contact Albert. Debbie lived across town from Irma on Bath Street. This was the residence address that Albert had given to the police when he was arrested on August 21, 1982, and this was the address used by the probation department. When the officers spoke with Debbie on those occasions, they informed her of the warrants for Albert's arrest. She informed them that Albert was not residing there any longer and she did not know where he was living.

In the early afternoon of March 8, 1983, the three officers were driving in an unmarked vehicle on Carpinteria Street and approached the intersection of South Soledad Street. They spotted Albert Perez walking toward them on Soledad Street, in the same block where Irma Perez lived in the apartment complex. When Albert saw them, he immediately turned and headed in the direction of the apartment. Detective Miller got out of the car while the others drove to a parking place. The three then walked through the apartment complex but saw no trace of Albert.

Sergeant Nalls then recalled that he had participated in an arrest of Albert Perez in July of 1980 on Soledad Street in front of the same complex. He further recalled that, at that time, a relative of Albert's named Irma Perez was living in the complex, but he could not remember which apartment she lived in. Additionally, Detective Miller remembered that in early 1982, he had talked to Albert in this area. At that time, Albert said he was residing at the complex (according to Detective Miller's testimony).

Not knowing which apartment Irma Perez lived in, the three officers radioed the police dispatcher, asking for the address that was marked on Albert Perez's 1980 arrest report. Because the dispatcher was unable to assist, the officers drove to a

nearby telephone and called the Santa Barbara Sheriff's narcotics detail to obtain the address. Detective Simmons was told that the address was apartment number 3 at 13 Soledad Street. While driving back to the apartment complex, a detective's message came over the radio. Sergeant Nalls testified that he interpreted the detective to have said that Albert lived in Apt. 3.[1] When the officers asked the dispatcher to cross-index the address, the dispatcher informed them that Irma Perez lived at apartment 3.

The officers planned to search the apartment and radioed for assistance from a uniformed officer. As they were waiting for the backup car, Detective Miller observed a Mr. William Roberts exit the complex. Detectives Miller and Simmons knew Roberts, since they previously had arrested him. Detective Miller approached Roberts and asked which apartment Albert Perez lived in. According to Detective Miller's testimony, Roberts responded that Albert lived in Apt. 3, and when asked if that was Irma's apartment, Roberts responded that it was. Detective Miller also testified that he asked Roberts if he had seen Albert recently, and Roberts replied that he had not. Roberts' testimony conflicted with Miller's; Roberts testified that he told the officers Albert did not live there, but that he had seen Albert walking down the street five or ten minutes earlier.

When the uniformed police officer—Officer Meske—arrived, all four officers went to Apt. 3 intending to apprehend Albert, though they had no arrest warrants with them. Detective Simmons' testimony at trial indicated that the officers believed Albert was staying at Irma's apartment. Sergeant Nalls testified that he did not check with any city agency to determine whether the apartment was listed to anyone in addition to Irma Perez. Indeed, the defendants do not now claim that any such check was made. Sergeant Nalls testified at trial that the idea of obtaining a search warrant to search Irma Perez's apartment "just didn't occur to [him]."

Sergeant Nalls went to the rear of the apartment, and the other three officers went to the front door, knocked, and stated that they were police officers looking for Albert Perez, that they believed he was in the apartment, and that they had a warrant for his arrest. They then requested consent to search. Detective Miller testified that Irma Perez opened the door and stated that Albert was not there, did not live there, and had never lived there. She demanded to see the arrest warrant. When the officers failed to produce it, she refused to consent to a search and began closing the door. At that point, Detectives Simmons and Miller shoved open the door and all of the officers entered.

The three plainclothes officers went upstairs and Officer Meske stayed downstairs. Irma Perez testified that after some conversation between her and Officer Meske, Officer Meske grabbed her from behind, threw her into a wooden rocking chair, and pinned her down with one knee on her leg and both of his hands on both of her wrists. She further testified that after approximately 30 seconds he let her up.

The officers did not find Albert Perez in the apartment. When the officers were on their way out of the apartment, Irma went to the telephone in the kitchen and dialed 911. She told the dispatcher that she wanted to "speak to somebody about policemen harassing me. . . ." The dispatcher told her to call the non-emergency number for the police. When she was about to make a second call, one of the officers cut off the call by depressing the receiver. Perez testified that she threw the telephone to the floor in anger. She was then spun around, thrown against the wall, handcuffed and told she was under arrest for harboring a fugitive.

Perez testified that she was led out the door in front of gathering neighbors to the police car, and was thrown into the vehicle with such force that her right shoulder slammed against the door frame, causing

---

1. The conversation was recorded on a dispatcher tape; however, the tape is muffled and does not clearly reveal the detective's precise words.

her pain. Irma was first taken to the Santa Barbara police station, and then to jail. She was released after posting $250 bail. The district attorney declined to prosecute her.

Perez brought this action under 42 U.S.C. § 1983 against the City of Santa Barbara and the four officers who entered her house. She claimed that the officers violated her civil rights by: (1) unlawfully searching her apartment without her consent or a search warrant; (2) falsely arresting her for harboring a fugitive; (3) using excessive force against her prior to and during the arrest; and (4) depriving her of her rights to free speech by preventing her from making the second phone call to the police and by arresting her in retaliation for insulting comments she directed at them. Her first cause of action was against the four police officers, and her second cause of action was against the City on a theory of municipal liability.

The case was tried before a jury. Upon conclusion of Perez's case-in-chief, the court granted the City's motion for a directed verdict and dismissed the second cause of action. The first cause of action was sent to the jury. The jury was provided a special verdict form which segregated issues of qualified immunity from issues of whether Perez's constitutional rights were violated. The jury unanimously found that the police officers did not violate any of Perez's constitutional rights; thus, they failed to reach any issues of qualified immunity.

On appeal, Perez challenges several of the jury instructions. Because we find reversible error in the instructions pertaining to the entry and search of her home, we need not address whether the other instructions were proper. We also conclude that the directed verdict in favor of the City was granted in error.

## II.

### JURY INSTRUCTIONS [2]

We must determine "whether, viewing the jury instructions as a whole, the trial

judge gave adequate instructions on each element of the case to ensure that the jury fully understood the issues." *Los Angeles Memorial Coliseum Comm. v. Nat'l Football League,* 726 F.2d 1381, 1398 (9th Cir.), *cert. denied,* 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984). The trial court has broad discretion in formulating instructions and will be reversed only upon a showing of an abuse of discretion. *United States v. Wellington,* 754 F.2d 1457, 1463 (9th Cir.), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985).

The trial judge gave the following instructions to the jury on the issue of whether the officers violated Perez's constitutional rights by forcibly entering into and searching her residence:

Under the Fourth Amendment, an arrest warrant is alone sufficient to authorize the entry into a person's home to effect an arrest. If you find that the police officers had reasonable cause to believe that the plaintiff's apartment was *inhabited by Albert Perez* at the time of the entry and the search, and they had reason to believe that Albert Perez was within the apartment, then the entry and search were constitutionally valid.

In determining whether a search is reasonable under the Fourth Amendment, *an inhabited residence is a place of occupancy, and is not restricted to a person's permanent home.*

(Emphasis added.)

The difficulty we have with the instruction lies in the definition of an inhabited residence as merely a place of occupancy. This leaves the jury with the understanding that any sort of temporary occupancy by one person of the home of another can subject that other person to a search of his or her home without a search warrant. We begin our analysis by noting the " 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreason-

---

**2.** The defendants argue that Perez has waived her right to challenge the instructions, contending that she failed to object to the instructions

with sufficient specificity. *See* Fed.R.Civ.P. 51. We find that her objections were adequately specific to meet the requirements of Rule 51.

able," and that "[a]bsent exigent circumstances, [the] threshold [of a home] may not reasonably be crossed without a warrant." *Payton v. New York,* 445 U.S. 573, 586, 590, 100 S.Ct. 1371, 1380, 1382, 63 L.Ed.2d 639 (1980).

In *Payton,* the Court held that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling *in which the suspect lives* when there is reason to believe the suspect is within." *Id.* at 603, 100 S.Ct. at 1388 (emphasis added). However, in *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the Court made it equally clear that, absent exigent circumstances, an arrest warrant does not justify entry into a *third person's* home to search for the subject of the arrest warrant. A search warrant is needed to protect the rights of the homeowner. *Id.* at 206, 101 S.Ct. at 1644.

In formulating this rule, the Court examined the purposes to be served by the two kinds of warrants. The Court noted, "[W]hile an arrest warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review, the interests protected by the two warrants differ." *Id.* at 212–13, 101 S.Ct. at 1647–48. The Court noted that an arrest warrant "primarily served to protect an individual from an unreasonable seizure," while a search warrant "safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police." *Id.* at 213, 101 S.Ct. at 1648. In *Steagald,* the officers relied upon an arrest warrant to enter the home of a third person in which the subject of the arrest warrant was thought to be. *Id.* at 212, 213, 101 S.Ct. at 1647, 1648. The Court explained that while the arrest warrant protected the interests of the suspect, "it did absolutely nothing to protect [the homeowner's] privacy interest in being free from an unreasonable invasion and search of his home." *Id.* at 213, 101 S.Ct. at 1648.

In this case, we are faced with a situation which falls between *Steagald* and *Payton.* The officers had an arrest warrant for Albert Perez. They could have legally entered his home to seize him. Yet they used it to enter the home of his sister, Irma, on the apparent belief that Albert had been staying there. If Albert had been an actual co-resident in the apartment, the search would have been legal because the arrest warrant authorizes entry into the suspect's own home, even if that home is shared by others. *See United States v. Ramirez,* 770 F.2d 1458, 1460 (9th Cir. 1985). However, if Albert did not actually reside in the apartment, the search was illegal under *Steagald.*

The question presented to us by this case is what constitutes a person's "home" within the meaning of *Payton* and *Steagald.* Here there was some evidence that Albert occasionally spent the night at Irma's home.[3] We must decide whether this temporary occupancy sufficed to make the apartment Albert's home as well so as to allow entry based on simply a warrant for Albert's arrest. The instructions to the jury stated that for purposes of determining Irma's Fourth Amendment rights, the search was legal if the police officers had reasonable cause to believe that Irma's apartment was "inhabited" by Albert at the time of the search. The court further instructed, "[a]n inhabited residence is a place of occupancy, and is not restricted to a person's permanent home." The court thus conveyed a clear impression to the jury that a search warrant was not needed if Albert was temporarily staying at Irma's apartment.

We find error in that instruction. Irma's Fourth Amendment rights revolve around her expectation of privacy in her own home. It is unlikely this expectation was lowered substantially when she allowed her brother to stay with her temporarily. She could not have considered Albert a co-resi-

---

**3.** Albert Perez testified in depositions that, prior to the incident, he typically spent the night at Irma's apartment two or three times a month for the purpose of babysitting her children. 6 RT 53. Irma Perez testified that, when Albert babysat her children overnight, he slept on a sofa, located downstairs in the living room. 2 RT 108, 65.

dent simply because he occupied her apartment for a short while. The Fourth Amendment's protection against unreasonable searches in a person's home is not diminished by the mere presence of a guest in the home. *Payton* allows entry into the suspect's *actual* home to execute an arrest warrant for the suspect. *See Payton*, 445 U.S. at 603, 100 S.Ct. at 1388. ("[A]n arrest warrant ... carries with it the limited authority to enter a dwelling in which the suspect *lives* when there is reason to believe the suspect is within." (Emphasis added)). The Court made it very clear in *Steagald* that the Fourth Amendment does not allow entry into a third person's home without a search warrant. We would impermissibly diminish the protection offered by *Steagald* were we to hold that, for purposes of the *homeowner's* Fourth Amendment rights, the dwelling is the "home" of whoever happens to be staying there.

The defendants assert that "for Fourth Amendment purposes, staying somewhere for a short period of time may be temporarily equivalent to a home." Though this assertion might be true for some Fourth Amendment purposes, it has no force in the case at hand. The privacy interest protected by the Fourth Amendment is personal to the individual asserting it. *See Steagald*, 451 U.S. at 219, 101 S.Ct. at 1651. The cases cited by the defendants involve the constitutional rights of accused persons who temporarily stay in a place. *See, e.g., United States v. Grandstaff*, 813 F.2d 1353 (9th Cir.), *cert. denied*, 484 U.S. 837, 108 S.Ct. 119, 98 L.Ed.2d 78 (1987); *Eng Fung Jem v. United States*, 281 F.2d 803 (9th Cir.1960); *Fequer v. United States*, 302 F.2d 214, 249 (8th Cir.), *cert. denied*, 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110 (1962); *United States v. Bulman*, 667 F.2d 1374, 1382–84 (11th Cir.), *cert. denied*, 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982). The issue in those cases is whether suspects have a reasonable expectation of privacy in a place of temporary occupancy. For these purposes, a hotel room has been held to be the equivalent of a home. *See Eng Fung Jem*, 281 F.2d at 804–05; *Fequer*, 302 F.2d at 249; *Bulman*, 667 F.2d at 1384. Those cases have little to do with this one, where an actual resident of the home asserts Fourth Amendment rights. As the Supreme Court stated in *Steagald*, "The issue here ... is not whether the subject of an arrest warrant can object to the absence of a search warrant [for] .. another person's home, but rather whether the residents of that home can complain of the search." *Steagald*, 451 U.S. at 219, 101 S.Ct. at 1651.

The privacy interests underlying Albert's and Irma's rights are markedly different. It may be true that if Albert's Fourth Amendment rights were at issue, Irma Perez's apartment might be considered his "residence," even though it was a very temporary place of occupancy. But it simply does not follow that, when analyzing *Irma's* constitutional rights, Albert must be considered a co-resident just because he spent the night there on occasion. On the contrary, when assessing whether the search violated Irma's rights, Albert must be considered a guest in her home if he stayed there only on a temporary basis.

A close reading of *Steagald* suggests that the circumstances in this case are similar to those in *Steagald*. In *Steagald*, the police received an anonymous phone call from an informant who stated that the subject of an arrest warrant—Ricky Lyons—might be reached at a certain phone number. The phone number was listed to a person other than Lyons. *See Steagald, sub nom United States v. Gaultney*, 606 F.2d 540, 543 (5th Cir.1979) (discussion of facts). During the next four days the police had several other conversations with the informant in which the informant told them that Lyons was at the same location. *See id.* The facts imply that Lyons stayed at the residence for at least a few days, and the Supreme Court noted that the police officers believed Lyons was a guest at the house. *Steagald*, 451 U.S. at 213, 101 S.Ct. at 1648. The Supreme Court, however, did not view the house as Lyons' residence. Similarly, we do not view Irma Perez's apartment as Albert's residence even though he may have occasionally spent a night there.

■ We hold that the trial judge erred in instructing the jury that, for the purposes

of determining Irma Perez's Fourth Amendment rights, her residence could be considered Albert's home even if he did not permanently reside there. Unless a jury finds that Albert was an actual co-resident of the apartment, and that the police had reasonable grounds for believing Albert was in the apartment at the time, *see Payton*, 445 U.S. at 603, 100 S.Ct. at 1388, the search was in violation of Irma Perez's constitutional rights. The Fourth Amendment right to be secure against warrantless searches within the home is too vital to justify entry without a search warrant to execute an arrest warrant upon a guest in the home, absent exigent circumstances.[4] *See Steagald*, 451 U.S. at 221, 101 S.Ct. at 1652.

## III.

### DIRECTED VERDICT

■ In her second cause of action, Perez seeks to hold the City liable for her claimed constitutional injury because she attributes the illegal search of her apartment to inadequate training received by the City's officers. The district court granted a directed verdict in favor of the City, which we review *de novo*. *West Am. Corp. v. Vaughan–Bassett Furniture Co.*, 765 F.2d 932, 934 (9th Cir.1985). The evidence must be viewed in the light most favorable to Perez, and all inferences must be drawn in her favor. *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1219 (9th Cir.1983), *cert. denied*, 471 U.S. 1007, 105 S.Ct. 1874, 85 L.Ed.2d 166 (1985). A directed verdict is appropriate when the evidence permits only one reasonable conclusion as to the verdict. *Peterson v. Kennedy*, 771 F.2d 1244, 1256 (9th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986).

The law of the circuit at the time of trial was that a city could be held liable under section 1983 for the constitutional violations of its police officers if the violation resulted from a municipal policy or custom. We held that a practice of gross negligence in training or supervision is a policy giving rise to municipal liability under section 1983. *Bergquist v. County of Cochise*, 806

F.2d 1364, 1370 (9th Cir.1986). This could result in municipal liability if the plaintiff established a direct causal link between the gross negligence in training and the constitutional deprivation. *Id.* at 1369–70. Applying these standards, we held that the trial court erred in granting the directed verdict because the evidence could have permitted a finding of municipal liability.

Since the trial and our judgment on appeal, the Supreme Court has articulated the circumstances in which a municipality can be held liable for inadequate police training, specifying a standard of deliberate indifference. *City of Canton v. Harris*, — U.S. —, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The Supreme Court vacated our earlier judgment on appeal in this case and remanded for our consideration in light of *City of Canton*. *Simmons v. Perez*, — U.S. —, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989).

The Court articulated its newly announced standard as follows:

[T]he inadequacy of policy training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.

. . . . .

But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*City of Canton*, 109 S.Ct. at 1204–05 (footnote 10 omitted). In footnote 10 of the opinion, which is referenced to this quotation, the Court cited two examples of situations in which a jury could reasonably find that a failure to train or inadequate training could amount to deliberate indifference.

In *City of Canton*, the Court noted that the standard of proof the district court had imposed was one consistent with Sixth Circuit precedent but lesser than the standard announced by the Court. The Court stated

---

**4.** The defendants do not claim that there were    any exigent circumstances in this case.

Whether respondent should have an opportunity to prove her case under the "deliberate indifference" rule we have adopted is a matter for the Court of Appeals to deal with on remand.

*Id.* at 1207. Justice Brennan, in his concurring opinion, stated, "The Court's opinion, which I join, makes clear that the Court of Appeals is free to remand this case for a new trial." *Id.*

The situation is similar in this case and we deem the appropriate action is to remand this claim against the City for retrial under the newly announced standards. Whether a directed verdict for the City would be appropriate in light of evidence produced at retrial would then be appropriate for the district judge to determine in the first instance.

## IV.

### CONCLUSION

We reverse the district court's judgment and remand for proceedings consistent with this opinion.

REVERSED and REMANDED.