**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Aaron Leon LITTERAL and Dell Rae
Wyatt, Defendants–Appellants.**

Nos. 88–1453, 89–10039.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 12, 1989.

Decided July 30, 1990.

Thomas V. Miles, Barry Nix, Mark Coleman, Fresno, Cal., for defendants-appellants.

Carl M. Faller, Asst. U.S. Atty., Fresno, Cal., for plaintiff-appellee.

Before CHOY, TANG and FLETCHER, Circuit Judges.

TANG, Circuit Judge:

Aaron Leon Litteral and Dell Rae Wyatt appeal their convictions on various charges relating to methamphetamine manufacturing. We affirm.

## FACTS AND PROCEEDINGS BELOW

In December of 1987, an informant told the El Paso, Texas, office of the United States Marshal that Litteral, the subject of a federal arrest warrant, was residing in Mohave, California. The El Paso office relayed this information to its Fresno office. On December 28, 1987, the Fresno office called the informant, a codefendant of Litteral in a prior case. She told the

Fresno Marshal's office that her brother and sister had seen Litteral at a mobile home in Mohave, California. She also said that Litteral had been living at that home for several months. The informant had also seen Litteral in Mohave driving a yellow Chevy Camaro and a blue Ford Bronco. On December 28, 1987, at approximately noon, the informant met with the United States Marshals in Mohave and repeated her information. At approximately 1:00 p.m., the informant went with the law enforcement officers on a drive-by of the residence. During the drive-by, the officers saw both a yellow Camaro and a blue Bronco. The informant told the United States Marshals that if the Bronco was at the residence, Litteral was probably there.

Between 1:30 and 1:45 p.m., law enforcement officers went to the property to execute the outstanding arrest warrant for Litteral. When they entered the property, the law enforcement officers encountered Wyatt who lived there. Soon after entry, the officers conducted a sweep of the mobile home and the adjacent buildings in an attempt to locate Litteral. While in the mobile home, one of the officers observed items in the bedroom which he identified as narcotics paraphernalia. He also observed a white powdery substance on the dresser and approximately $3,000 in cash spread out on the bed.

Approximately fifteen minutes after the officers first entered the property, Litteral drove up in a pickup truck. The officers arrested Litteral pursuant to the arrest warrant. Based on what the officer had seen in the mobile home, the law enforcement officials obtained a telephonic search warrant. When the officers executed the search warrant, they found: (1) numerous items of equipment which are used to manufacture methamphetamine, including flasks, a heating mantle, a condenser, a scale and breathing devices; (2) liquid which included methamphetamine; (3) chloropseudoephedrine, a powder which is produced during an intermediate step in the manufacturing of methamphetamine; (4) documents located in a briefcase in the living room which listed chemicals necessary to manufacture methamphetamine as

well as an outline of the manufacturing process (subsequent analysis revealed numerous fingerprints of Wyatt on these documents); (5) methamphetamine; and (6) a receipt from a chemical company for the purchase of two chemicals used in a methamphetamine manufacturing process.

After his arrest, Litteral made a number of statements to law enforcement officers. He said that he had been living at the property off and on since August 1987. In addition, he said that the majority of the methamphetamine lab had been moved several days prior to his arrest and that the rest of the lab would have been moved in the next couple of days. He also stated that the laboratory could produce 100 pounds of methamphetamine but that it took more than two people and several days to accomplish that. Finally, he said that the several large drums that were found on the property were used for mixing chemicals during the "chlorination" stage of the methamphetamine manufacturing.

On January 28, 1988, the grand jury indicted Litteral and Wyatt for conspiracy to manufacture methamphetamine, as well as for manufacturing methamphetamine. The grand jury also indicted Wyatt for maintaining a place for the manufacturing of methamphetamine.

Wyatt moved to quash the search warrant and suppress evidence. In her motion, Wyatt contended that the officers did not have reason to believe that Litteral was on the property. She also argued that the officers' conduct violated her privacy expectations. Litteral joined Wyatt's motion on the basis that he had standing because he had lived on the premises on and off since August of 1987.

At the hearing on the motion to suppress, Wyatt stated that Litteral did not live on the property but was there from time to time and slept there occasionally. She estimated that Litteral was present at the residence ten percent of the time.

The district court denied Wyatt's and Litteral's motion to suppress. In that denial, the district court stated that the infor-

mant's statement "that Litteral has been residing in the mobile home has not been discredited."

Litteral also filed a motion asking the district court either to declare the Sentencing Guidelines unconstitutional, or in the alternative to find that the Guidelines did not apply to him. Wyatt joined Litteral's motion. The district court sentenced Litteral under both the Guidelines and the preexisting sentencing scheme. The district court also sentenced Wyatt under both the Guidelines and the preexisting sentencing scheme. Both Litteral and Wyatt filed timely appeals.

## DISCUSSION

### Litteral's Appeal

### 1. Sufficiency of the Evidence

Litteral contends that insufficient evidence supports his convictions for (1) conspiracy to manufacture methamphetamine; and (2) manufacturing, or aiding and abetting in the manufacturing of methamphetamine.

In reviewing the sufficiency of the evidence on appeal, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *see also United States v. Luttrell*, 889 F.2d 806, 809 (9th Cir.1989).

"The essential elements of a conspiracy are (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *United States v. Meyers*, 847 F.2d 1408, 1412–13 (9th Cir.1988). " 'The prosecution need not show the agreement to have been explicit. An implicit agreement may be inferred from the facts and circumstances of the case.' " *United States v. Hernandez*, 876 F.2d 774, 777 (9th Cir.) (quoting *United States v. Monroe*, 552 F.2d 860, 862 (9th Cir.), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1069

(1977)), *cert. denied*, — U.S. —, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989). "Once the existence of the conspiracy is shown, evidence establishing beyond a reasonable doubt a knowing connection of the defendant with the conspiracy, even though the connection is slight, is sufficient to convict him of knowing participation in the conspiracy." *Meyers*, 847 F.2d at 1413.

To prove that a defendant has manufactured methamphetamine, the government must show that a defendant manufactured the drug and did so knowingly or intentionally. *See* 21 U.S.C. § 841(a)(1).

"The elements necessary to convict an individual under an aiding and abetting theory are (1) that the accused had the specific intent to facilitate the commission of a crime by another, (2) that the accused had the requisite intent of the underlying substantive offense, (3) that the accused assisted or participated in the commission of the underlying substantive offense, and (4) that someone committed the underlying substantive offense." *United States v. Gaskins*, 849 F.2d 454, 459 (9th Cir.1988).

We conclude that sufficient evidence supports Litteral's convictions for (1) conspiracy to manufacture methamphetamine; and (2) manufacturing methamphetamine, or aiding and abetting in the manufacturing of methamphetamine. A rational jury could have convicted Litteral on both counts based on the following evidence: (1) Litteral admitted he lived at Wyatt's mobile home on and off for four months prior to his arrest; (2) the mobile home contained (i) methamphetamine powder, (ii) a receipt for purchase of chemicals used in methamphetamine production, (iii) chloropseudoephedrine, a chemical produced during an intermediate step in the manufacturing process, (iv) a shopping list of chemicals to produce methamphetamine, (v) an outline of the steps in methamphetamine production, (vi) liquid in the freezer which contained methamphetamine; (3) expert testimony that freezing methamphetamine maximizes the amount of methamphetamine that can be produced; (4) Litteral's statement that most of the laboratory had been dismantled; and (5) Litteral's statements that the

lab could produce 100 pounds of methamphetamine.

This evidence sufficiently supports the conspiracy charge. From the abundant evidence of manufacturing, as well as Litteral's admission of involvement in manufacturing, any rational jury could find that Litteral and Wyatt had agreed to conspire to manufacture methamphetamine. Litteral's admission of involvement provides the knowing connection to the conspiracy.

■ Though the lab may not have been manufacturing drugs at the moment the officers executed the warrant, the evidence found and Litteral's admission provides more than sufficient evidence for a jury to conclude that manufacturing had recently occurred at the site. Indeed, the jury could even have concluded that the manufacturing was ongoing because the liquid found in the freezer was a manufacturing step designed to maximize the methamphetamine produced.

Moreover, given Litteral's admission and the evidence that someone had manufactured methamphetamine, the jury could have found all the necessary elements to convict Litteral as an aider and abettor.

2. *Constitutionality & Application of Sentencing Guidelines*

Litteral argues the Sentencing Guidelines are unconstitutional for four reasons: (1) the Guidelines violate due process because they fail to grant the trial judge adequate discretion to individualize sentencing; (2) the Guidelines violate due process because the Sentencing Commission went beyond its statutory mandate when it decided that straight probation should be available only rarely; (3) the Guidelines violate the Presentment Clause of Article I of the United States Constitution because after the Sentencing Commission promulgated the Guidelines they were not presented to the President; and (4) the Guidelines violate due process because the criminal history category looks at the lengths of sentences imposed on past convictions.

Litteral also contends that the Sentencing Guidelines do not apply to him for two reasons. First, there is no evidence that the offenses occurred after the Guidelines became effective. Second, he was sentenced after the Ninth Circuit declared the Guidelines unconstitutional in *Gubiensio-Ortiz v. Kanahele,* 857 F.2d 1245 (9th Cir. 1988), but before the Supreme Court upheld the guidelines in *Mistretta v. United States,* 488 U.S. 361, ——, 109 S.Ct. 647, ——, 102 L.Ed.2d 714 (1989). He asserts that during this "window period" the Guidelines do not apply retroactively.

(i) Constitutionality Issues

a. *Standard of Review*

■ This court reviews *de novo* the constitutionality of a statute. *See United States v. Savinovich,* 845 F.2d 834, 839 (9th Cir.), *cert. denied,* 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988).

b. *Merits*

(1) Individual Sentencing

We reject this argument for the reasons we recently set forth in *United States v. Brady,* 895 F.2d 538 (9th Cir.1990).

(2) Availability of Probation

We reject this argument for reasons we recently set out in *United States v. Belgard,* 894 F.2d 1092 (9th Cir.1990).

(3) Presentment Clause

■ In *Immigration & Naturalization Serv. v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the Supreme Court struck down legislative vetoes on the ground that such enactments violated the Presentment Clause of Article I of the Constitution because they had not been presented to the President for his signature. In *Chadha,* Congress had authorized the Attorney General to suspend deportation of an alien. *Id.* at 924, 103 S.Ct. at 2770. However, when the Attorney General exercised this power, he or she had to report the suspension to Congress. *Id.* at 924–25, 103 S.Ct. at 2770–71. Once Congress received the report, either the House of Representatives or the Senate could "veto" the suspension. *Id.* at 925, 103

S.Ct. at 2770–71. The Supreme Court found this veto violated the Presentment Clause. *See id.* at 952–54, 103 S.Ct. at 2784–85.

We conclude that the Sentencing Guidelines do not violate *Chadha.* The legislative scheme of the Sentencing Guidelines is unlike the one presented in *Chadha.* The section which Litteral refers to, Section 994(p), does state that the Guidelines, or any changes in them, only become effective 180 days after they are reported to Congress. *See* 28 U.S.C. § 994(p). However, Section 994(p) does not give Congress the authority to veto the Guidelines or any subsequent changes. *Id.* Indeed, that section explicitly states that only a new act of Congress can change the 180 day period, the Guidelines, or any amendment. *Id.* Such a means of controlling an enactment is constitutional. *See Bowsher v. Synar,* 478 U.S. 714, 733–34, 106 S.Ct. 3181, 3191, 92 L.Ed.2d 583 (1986) ("[O]nce Congress makes its choice in enacting legislation, its participation ends. Congress can thereafter control the execution of its enactment only indirectly—by passing new legislation.").

If anything, the 180–day delay in effectiveness of the Guidelines, or any amendment to the Guidelines, is a "report and wait" provision which allows Congress an opportunity to review the Guidelines or amendments before they become effective and to pass legislation barring their effectiveness if Congress finds the Guidelines or amendments objectionable. *See Chadha,* 462 U.S. at 935 n. 9, 103 S.Ct. at 2776 n. 9 (description of what a "report and wait" provision entails.) The Supreme Court has approved the use of report and wait provisions. *See id.*

### (4) Criminal History

■ Litteral's due process argument concerning the Sentencing Guidelines' criminal history section raises two different issues. First, he raises, not a due process claim, but an equal protection claim because he suggests that the use of the lengths of prior sentences promotes disparate treatment. Second, in attacking the use of the lengths of prior sentences to determine the criminal history score, his second argument is a claim that the Guidelines violate due process because of the type of information they allow a court to consider.

#### a. *Equal Protection*

This circuit has held that "persons convicted of crimes are not a suspect class." *United States v. Smith,* 818 F.2d 687, 691 (9th Cir.1987). Thus, to be successful in his equal protection challenge, Litteral must demonstrate that use of the length of prior sentences to help determine his criminal history score is not rationally related to a legitimate government interest. *See id.*

We conclude no equal protection violation occurs because of the use of the lengths of prior sentences in determining the criminal history score. The lengths of prior sentences are related to the severity of the prior offenses because generally more serious offenses draw longer sentences. There is a legitimate government interest in having more dangerous criminals serve longer sentences. Therefore, using the length of prior sentences to help calculate the severity of a defendant's criminal history is rationally related to a legitimate government interest in having more dangerous criminals serve longer sentences.

#### b. *Due Process*

■ "Violations of a defendant's due process rights occur when a court relies on materially false or unreliable information in sentencing." *United States v. Columbus,* 881 F.2d 785, 787 (9th Cir.1989).

We conclude that the use of the lengths of prior sentences to help determine a defendant's criminal history does not violate due process. Litteral has not shown that the use of the lengths of prior sentences is necessarily unreliable. Therefore, the use of lengths of prior sentences has not been shown necessarily to violate due process.

Even if we assume that the lengths of prior sentences are often unreliable, we need not conclude that the use of the lengths of prior sentences violates due process. The Guidelines do not require that

the lengths of prior sentences be used alone to determine a defendant's criminal history. Instead, the Guidelines allow consideration of information other than the lengths of past sentences. *See* Guideline 4A1.3. This opportunity to correct unreliable uses of the lengths of prior sentences minimizes the likelihood of any due process violations. *See United States v. White*, 869 F.2d 822, 828 (5th Cir.) ("the guidelines allow the defendant to introduce information concerning the seriousness of an underlying conviction so that an accurate criminal history category can be set by the court."), *cert. denied*, —— U.S. ——, 109 S.Ct. 3172, 104 L.Ed.2d 1033 & —— U.S. ——, 110 S.Ct. 560, 107 L.Ed.2d 555 (1989).

### (ii) Application Issues

#### a. *Standard of Review*

■ This court reviews the legality of a criminal sentence *de novo. United States v. Cervantes–Lucatero*, 889 F.2d 916, 917 (9th Cir.1989).

#### b. *Merits*

##### (1) Evidence of Date of the Offense

The Sentencing Guidelines only apply to offenses committed after November 1, 1987. *United States v. Rewald*, 835 F.2d 215, 216 (9th Cir.1987).

Here, as set out in the facts and proceedings and sufficiency of evidence sections of this opinion, abundant evidence exists that Litteral's offenses occurred on or near December 28, 1987.

##### (2) Window Period

■ We reject this argument because we have held that the Guidelines do apply retroactively during the window period. *United States v. Kane*, 876 F.2d 734, 735–36 (9th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 173, 107 L.Ed.2d 130 (1989).

### *Wyatt's Appeal*

#### 1. *Motion to Suppress*

■ Wyatt contends that the district court erred when it denied her motion to suppress evidence obtained from the search of the mobile home because (1) Litteral was not a resident and therefore Litteral's arrest warrant did not authorize entry on the property; and (2) even if Litteral was a resident, law enforcement officials had no reasonable belief that Litteral would be present at the time of the execution of their arrest warrant.

#### a. *Standard of Review*

"Motions to suppress are generally reviewed *de novo." United States v. Thomas*, 863 F.2d 622, 625 (9th Cir.1988). "[M]ixed questions of law and fact usually require *de novo* review, although the clearly erroneous standard applies if the necessary analysis is predominantly factual in nature." *Id.*

#### b. *Merits*

##### (1) Litteral's Residence

In *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980), the Supreme Court held that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." However, in *Steagald v. United States*, 451 U.S. 204, 215–16, 101 S.Ct. 1642, 1649–50, 68 L.Ed.2d 38 (1981), the Supreme Court held that, absent exigent circumstances, an arrest warrant does not justify entry into a third person's home to search for the subject of the arrest warrant.

Thus, under *Steagald*, if the suspect is just a guest of the third party, then the police must obtain a search warrant for the third party's dwelling in order to use evidence found against the third party. *See id.* at 213, 101 S.Ct. at 1648. But if the suspect is a co-resident of the third party, then *Steagald* does not apply, and *Payton* allows both arrest of the subject of the arrest warrant and use of evidence found against the third party. *See United States v. Robertson*, 833 F.2d 777, 780 (9th Cir. 1987).

In *Perez v. Simmons*, 884 F.2d 1136, 1140 (9th Cir.1988), a section 1983 action, this circuit considered "what constitutes a

person's 'home' within the meaning of *Payton* and *Steagald*." In *Perez*, Albert Perez, the subject of the arrest warrant, had occasionally spent the night at his sister Irma's apartment. The *Perez* court refused to view "Irma Perez's apartment as Albert's residence even though he may have occasionally spent a night there." *Id.* at 1141.

The *Perez* court summarized its holding by stating that a violation of Irma Perez's Fourth Amendment rights occurred "[u]nless a jury finds that Albert was *an actual co-resident of the apartment,* and the police had reasonable grounds for believing that Albert was in the apartment at the time...." *Id.* at 1142 (emphasis added).

Here, we conclude that the district court did not err when it concluded that Litteral was a co-resident with Wyatt in the mobile home. Although there is evidence in the record that suggests that Litteral was just a frequent guest, other evidence indicates that Litteral was a co-resident. Because conflicting evidence exists on the question of whether Litteral was a co-resident, we conclude that the district court's determination that Litteral was a co-resident was not clear error.

### (2) Litteral's Presence at the Property

■ As mentioned above, in addition to the co-resident requirement, police must also have reasonable grounds for believing that the subject of the arrest warrant is present at the time of the warrant's execution. *See Perez*, 884 F.2d at 1142.

We conclude that the district court's finding that the police had a reasonable grounds for believing that Litteral was present at the property was not clear error. The informant told the agents that if Litteral's car was there, he would be there. The agents spotted Litteral's car before they entered the property. Thus, the police had a reasonable belief that Litteral would be present.

### 2. *Ineffective Assistance of Counsel*

■ Wyatt contends that her counsel acted ineffectively because he failed to develop a number of facts at the suppression hearing.

To decide this claim, we must apply the two tier test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, a defendant must show that her counsel's actions were outside the wide range of professionally competent assistance. *United States v. Layton*, 855 F.2d 1388, 1414 (9th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1178, 103 L.Ed.2d 244 (1989). Second, a defendant must demonstrate that she was prejudiced by reason of counsel's actions. *Id.*

We conclude that Wyatt cannot meet the *Strickland* test. While her counsel may have more effectively developed the facts related to the argument about Litteral's co-residency, he more than adequately presented Wyatt's motion to suppress.

### 3. *Sufficiency of the Evidence*

The evidence admitted against Wyatt is essentially the same as the evidence admitted against Litteral. Thus, for reasons outlined above, we conclude the evidence was sufficient.

### 4. *Constitutionality & Application of Sentencing Guidelines*

We reject Wyatt's claims about the unconstitutionality of the guidelines for reasons set out in our discussion of Litteral's appeal.

### CONCLUSION

We affirm Litteral's convictions. The evidence was sufficient to support his convictions. Litteral's constitutional arguments lack merit.

We also affirm Wyatt's convictions. The findings concerning Litteral's co-residence and presence on Wyatt's property were not clearly erroneous. Wyatt's constitutional arguments lack merit. Wyatt's sufficiency of the evidence claim and ineffective assistance of counsel claim lack merit as well.

AFFIRMED.