MARTEN, District Judge.
On December 7, 1993, FBI Special Agent Samuel Michael McPheters and Bureau of Indian Affairs (“BIA”) Police Officer Gregory Littlewhiteman arrived at the plaintiff Rosanna Valdez’s residence in La-Point, Utah. The officers told the plaintiff that there was an outstanding felony warrant for the arrest of her son, Raymond Nathaniel Valdez. McPheters told the plaintiff they would like to come inside to see if her . son was present.
There is a dispute as to whether the plaintiff consented to the officers’ entry. According to the officers, the plaintiff told them to “go ahead.” The plaintiff states that she told the officers they could not search for her son without a search warrant.
Special Agent McPheters looked through the residence while Officer Little-whiteman remained with several other persons in the living room area. When they were unable to find Raymond Valdez, the officers left the residence and continued their investigation. They spoke with Sherman Dubois, who told the officers that he had seen Raymond Valdez at the residence earlier in the day. The officers then returned to the Valdez residence, but were again unable to find Raymond.
On December 27, Raymond Valdez surrendered to authorities and was placed in the Uintah County jail.
Plaintiff Rosanna Valdez subsequently instituted the present action, alleging the defendants McPheters and Littlewhiteman violated her constitutional rights against unreasonable search and seizure. On March 14, 1996, the District Court granted the defendants’ Motion for Summary Judgment. This appeal followed.
Special Agent Samuel Michael McPhet-ers has worked for the FBI for 27 years. At the time of the events giving rise to this litigation, he served as Resident Agent in Charge of the FBI’s Vernal, Utah office. Officer Gregory Littlewhiteman is a BIA Police Officer assigned to the Uintah and Ouray Agency, headquartered at Ft. Du-chesne, Utah. Littlewhiteman is an enrolled member of the Oglala Sioux tribe. As a result of his job and participation in community outreach activities, Littlewhite-man has become personally acquainted with many of the people who live on or around the Uintah-Ouray reservation.
In November of 1993, the Salt Lake City Police Department obtained an arrest warrant for Raymond Nathaniel Valdez. Valdez was charged by information with one count of burglary (a second degree felony), and one count of theft (a third degree felony). The Salt Lake City police requested assistance from the FBI in apprehending Valdez, advising the agency that “VALDEZ comes into the city on weekends, does a burglary or two then goes back to the Indian Reservation at LaPoint, Utah. VALDEZ’s mother, ROSANNE VALDEZ, lives at LaPoint.” The police also provided the agency with the telephone number for the Valdez residence. (R. 8, at 1).
Rosanna Valdez, the plaintiff, lives in Uintah County, near the town of LaPoint, Utah, with her husband Raymond Valdez, Sr., and several other family members. The residence has a telephone, the number matching that given by the Salt Lake City police to the FBI. An attorney fact sheet filed with the warrant lists Raymond, Jr.’s physical characteristics and denominates his address as “transient.” (R. 7).
The FBI’s Fugitive.Task Force notified Special Agent McPheters of the state arrest warrant for Raymond Valdez on December 7, 1993. McPheters drove to the BIA police headquarters in Ft. Duchesne, where he asked Lt. Ed Reynolds about Valdez’s whereabouts. Reynolds told McPheters that Valdez was living at the *1223 Valdez residence in LaPoint. Reynolds assigned Officer Littlewhiteman to assist in finding Valdez.
Littlewhiteman told McPheters that Valdez was living at the Valdez residence in LaPoint. Littlewhiteman based this conclusion on information he had gathered during his police duties. This information included the following:
1) On September 27, 1993, while being booked on a drug charge, Valdez stated in Littlewhiteman’s presence that he lived with his mother in LaPoint.
2) Littlewhiteman knows Valerie Tom, who is a friend, neighbor and relative of his wife. In the fall of 1993, Tom was married to Odorico Palesides. Littlewhiteman had twice arrested Palesides on spouse abuse charges during this time period. During the course of making these arrests, Litt-lewhiteman learned that Palesides was an associate of Raymond Valdez. He also knew by sight Tom’s Toyota pickup truck. Tom told Littlewhite-man that Palesides used the pickup truck to drive to the Valdez residence to meet Raymond Valdez, and that the two would go out drinking. This information corresponded with Little-whiteman’s observations during his routine patrols, having seen the pickup truck on several occasions at the Valdez residence during October and November.
3) On December 3, 1993, Roosevelt City Police Officer Steve Hooley told Litt-lewhiteman that Raymond Valdez was living at the Valdez residence in LaPoint.
4) On December 4,1993, Littlewhiteman investigated a single-vehicle accident about a quarter mile from the Valdez residence. He recognized the vehicle as Valerie Tom’s Toyota truck. The vehicle was abandoned, but two star-shaped imprints on the windshield indicated that a driver and a passenger had been in the truck at the time of the accident. Footprints led from the vehicle in the direction of the Valdez residence.
is a dispute about what one of the neighbors told Littlewhiteman in con-with the accident. According to Littlewhiteman, Bonnie Hackford. Mur-told him she had seen the truck at Valdez residence earlier in the day, by a Mexican male, and that she previously seen this person in the company of Raymond Valdez. The plaintiff has submitted an affidavit from Murphy denying she made these com-to Littlewhiteman. It is undis-however, that the accident occurred in close proximity to the Valdez residence, and that Littlewhiteman knew vehicle was used by a friend of the suspect under investigation.
5)It is uncontroverted that Littlewhite-man knew that Raymond Valdez was unemployed, that he liked to stay out late at night drinking, that he sometimes abused drugs including heroin and cocaine, and that he was suspected of several nighttime burglaries. From the knowledge of his lifestyle gained during the course of his normal law enforcement duties, Little-whiteman believed that Valdez would be at the Valdez residence about noon on December 7, 1993.
The district court granted the defendants’ summary judgment motion, finding under Payton v. New York, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980) and Steagald v. United States, 451 U.S. 204, 214 n. 7, 101 S.Ct. 1642, 1649 n. 7, 68 L.Ed.2d 38 (1981), the legality of the defendants’ entry into the Valdez residence was governed by the “reasonable belief of an officer, qualified immunity as to whether a person is in a residence at a place and present there.” (R. 5, Tr. at 42). The court then concluded that there were “sufficient grounds upon which a reasonable officer could form that belief [and] therefore qualified immunity does apply.” Id. at 42-43.
In the present appeal, Valdez contends that the defendants’ entry into her residence violated her rights protected under *1224 the Fourth Amendment. A person’s expectation of privacy in her residence “is plainly one that society is prepared to recognize as justifiable.” United States v. Karo, 468 U.S. 705, 714, 104 S.Ct. 3296, 3303, 82 L.Ed.2d 530 (1984). “At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.” Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961). In order to protect this important interest, the Supreme Court has emphasized that the Fourth Amendment draws “a firm line at the entrance to the house,” prohibiting a warrantless entry except in limited circumstances. Payton, 445 U.S. at 590, 100 S.Ct. at 1382.
One of the circumstances which may permit an entry into a residence without a search warrant is the existence of a valid arrest warrant for a suspect who is believed to live in the residence. This is because “an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.” Payton, 445 U.S. at 603, 100 S.Ct. at 1388. “Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person’s privacy interest when it is necessary to arrest him in his home.” Steagald, 451 U.S. at 214 n. 7, 101 S.Ct. at 1649 n. 7. Absent exigent circumstances, however, an arrest warrant by itself does not authorize entry into the home of a third party. Id., at 215, 101 S.Ct. 1642.
The majority of circuits which have addressed the issue have agreed that, under Payton, police officers entering a residence pursuant to an arrest warrant must demonstrate a reasonable belief that the arrestee lived in the residence, and a reasonable belief that the arrestee could be found within the residence at the time of the entry. See United States v. Route, 104 F.3d 59, 62 (5th Cir.) (“A valid arrest warrant carries with it the implicit but limited authority to enter the residence of the person named in the warrant in order to execute the warrant, where there is ‘reason to believe’ that the suspect is within”), cert. denied, 521 U.S. 1109, 117 S.Ct. 2491, 138 L.Ed.2d 998 (1997); United States v. Risse, 83 F.3d 212, 216 (8th Cir.1996) (“officers executing an arrest warrant must have a ‘reasonable belief that the suspect resides at the place to be entered ... and [have] reason to believe that the suspect is present’ at the time the warrant is executed”); United States v. Lauter, 57 F.3d 212, 215 (2nd Cir.1995) (“the proper inquiry is whether there is a reasonable belief that the suspect resides at the place to be entered ... and whether the officers have reason to believe that the suspect is present”); United States v. Edmonds, 52 F.3d 1236, 1248 (3d Cir.1995) (although “the information available to the agents clearly did not exclude the possibility that [the suspect] was not in the apartment, the agents had reasonable grounds for concluding that he was there”), vacated in part on other grounds, 52 F.3d 1236, 1251 (3d Cir.1995), cert. denied U.S. 519 U.S. 927, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996); United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir.) (“the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect’s dwelling, and that the suspect is within the residence at the time of entry”), cert. denied, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995). This court has recently agreed in an unpublished decision, Anderson v. Campbell, 1996 WL 731244 (10th Cir.1996).
Only one circuit has suggested a higher knowledge standard on the part of law enforcement officers. In United States v. Harper, 928 F.2d 894 (9th Cir.1991), the Ninth Circuit concluded that “the police may enter a home with an arrest warrant only if they have probable cause to believe the person named in the warrant resides there.” The court provided no rationale for adopting this standard, merely citing *1225 its prior decision in Perez v. Simmons, 900 F.2d 213 (9th Cir.1990), amending 884 F.2d 1136 (9th Cir.1989).[1]
This court finds the defendants were entitled to enter the Valdez residence if there was a reasonable basis for believing that Raymond Valdez, Jr. both (1) lived in the residence and (2) could be found within at the time of entry. As to the level of knowledge required by the officers, the Supreme Court in Payton explicitly indicated that entry is permissible so long as there is “reason to believe the suspect is within.” 445 U.S. at 603, 100 S.Ct. 1371. There is no substantial reason to believe that the standard of knowledge should be different or greater when it comes to the other prong of the Payton test, whether the suspect resides at the house.. It would be curious indeed if the two prongs of the test were governed by two different standards of proof.
More importantly, requiring actual knowledge of the suspect’s true residence would effectively make Payton a dead letter. In the real world, people do not live in individual, separate, hermetically-sealed residences. They live with other people, they move from one residence to another. Requiring that the suspect actually reside at the residence entered would mean that officers could never rely on Payton, since they could never be certain that the suspect had not moved out the previous day and that a Bivens or a 42 USC § 1983 claim would then be made against them by another resident. The better rule is that both prongs of the Payton test are governed by the same test—reasonable belief on the part of the officers. The officers’ belief need not prove true in fact, it is sufficient if the belief was objectively reasonable at the time of entry. United States v. Risse, 83 F.3d 212, 216 (8th Cir.1996). See Anderson, 1996 WL 731244, at *2 (“the officers’ belief that Steven was residing at home, while perhaps not correct, was reasonable”).
Payton and Steagald cannot be understood to divide the world into residences belonging solely to the suspect on the one hand, and third parties on the other. The rule announced in Payton is applicable so long as the suspect “possesses common authority over, or some other significant relationship to,” the residence entered by police. Risse, 83 F.3d at 217. Thus, entry into a residence pursuant to an arrest warrant is permitted when “the facts and circumstances within the knowl *1226 edge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect’s dwelling, and that the suspect is within the residence at the time of entry.” Magluta, 44 F.3d at 1535.
Turning to the second prong of the Payton test, courts “must be sensitive to common sense factors indicating a resident’s presence.” Direct surveillance or the actual viewing of the suspect on the premises is not required. Magluta, 44 F.3d at 1535, 1538.[2] Indeed, the officers may take into account the fact that a person involved in criminal activity may be attempting to conceal his whereabouts. Id., at 1538. The suspect’s presence may be suggested by the presence of an automobile, United States v. Morehead, 959 F.2d 1489, 1496 (10th Cir.1992), aff'd on other grounds sub nom., United States v. Hill, 971 F.2d 1461 (10th Cir.1992) (en banc); United States v. Beck, 729 F.2d 1329, 1331-32 (11th Cir.1984); Magluta, 44 F.3d at 1537-38; the time of day, United States v. Terry, 702 F.2d 299, 319 (2d Cir.), cert. denied, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983) (reasonable to believe suspect would be at home at 8:45 a.m. on Sunday morning); Edmonds, 52 F.3d at 1248 (entry at 6:45 a.m. was “early enough that it was unlikely someone living in the apartment would have already departed for the day”); Anderson, 1996 WL 731244 (“the officers came to the home at 8:45 p.m., on a cold, snowy evening, a time when a person would reasonably be expected to be at home”); observing the operation of lights or other electrical devices, Route, 104 F.3d at 63 (officers heard television set left on inside residence after third person left residence); Magluta, 44 F.3d at 1538 (observations that “the lawn was manicured and a porch light was on” gave “no indication that Magluta departed, such as for work or the like”); Morehead, 959 F.2d at 1496 (holding that an illuminated light provided a reasonable basis for officers to believe the subject of an arrest warrant was within the building); and the circumstances of a suspect’s employment, Lauter, 57 F.3d at 215 (officer’s conduct reasonable since they knew the suspect “was unemployed and typically slept late”); United States v. Woods, 560 F.2d 660, 665 (5th Cir.1977), cert. denied, 435 U.S. 906, 98 S.Ct. 1452, 55 L.Ed.2d 497 (1978) (reasonable to believe suspect would be “at his place of abode, especially at 8:30 in the morning for a man not known to be working”). And the officers may consider an absence of evidence the suspect is elsewhere. See Terry, 702 F.2d at 319 (one factor in supporting reasonableness was twelve-year-old son’s failure to indicate father was not inside). No single factor is, of course, dispositive. Rather, the court must look at all of the circumstances present in the case to determine whether the officers entering the residence had a reasonable belief that the suspect resided there and would be found within.[3]
In the present case, the Salt Lake City Police Department had informed the FBI that Raymond “comes into the city on weekends, does a burglary or two then *1227 goes back to the Indian reservation at LaPoint, Utah.” BIA Lt. Reynolds told defendant McPheters that Raymond lived with his mother. Raymond himself had told BIA Officer Littlewhiteman in September that he lived with his mother. Littlewhiteman also had seen a white pickup truck at the Valdez house, which he knew was driven by a friend of Raymond’s.[4] Another BIA officer told Little-whiteman that Raymond was at the Valdez house on December 3. On December 4, the white pickup truck was found wrecked near the Valdez house and footprints led from the truck toward the Valdez house.
Littlewhiteman submitted an affidavit stating that he knew Raymond would probably be home around midday, since he knew Raymond was unemployed, liked to stay out late drinking, sometimes abused drugs such as heroin and cocaine, and was suspected of having committed at least two nighttime burglaries.[5] Significantly, the plaintiff did not attempt to offer any facts which would contradict Littlewhiteman’s affidavit on Raymond’s suspected nocturnal activities. In her response to the summary judgment motion, plaintiff complains that the affidavit was “nonsensical, nonfactual and therefore irrelevant.” (R. Exh. 3 at ¶ 17). She does not, however, offer any evidence which would controvert this portrait of Raymond Valdez, Jr.’s night life. The evidence of late-night drinking, drug abuse, and unemployment is therefore uncontroverted. More importantly, the ultimate accuracy of the affidavit’s characterization of Raymond’s lifestyle is not significant. What is significant, and also uncontroverted, is that Littlewhite-man had been presented with such information prior to the entry into the Valdez residence. Finally, after the first search on December 7, a witness (Sherman Du-Bois) told McPheters and Littlewhiteman that he had seen Raymond at the Valdez residence earlier that day.
Plaintiff Valdez stresses that she denied to the defendants that Raymond lived there or that she and her family knew where he in fact was. It is also stressed that the Salt Lake County Attorney Fact Sheet prepared in connection with the investigation lists Raymond’s address as “transient.” (R. Exh. 7 at 1). If this were the only evidence in the case as to Raymond’s residence, it would of course fatally undermine the defendants’ qualified immunity based on an objective belief Raymond lived at the Valdez residence. But, under the circumstances of the case, such information only tends to support a determination of qualified immunity. That is, the officers knew from a variety of sources that Raymond had been living with his mother, including Raymond’s own statements in the presence of defendant Little-whiteman. The fact that the suspect was otherwise known to be young, unemployed, and “transient” suggests, if anything, that *1228 he was still living with his family in the Valdez residence.
Given the facts present in the case, the district court did not err in concluding that the defendants could have reasonably concluded that Raymond Valdez, Jr. lived in the residence, and that he would likely be present inside.[6]
AFFIRMED.

. Perez, however, does not directly support a determination that "probable cause” rather than "reasonable grounds” is the appropriate standard. In its initial opinion, the court in Perez was concerned by evidence that suggested the person named in the warrant, the plaintiff's brother, was at most a temporary guest in his sister's searched apartment, and at most “may have occasionally spent the night there.” 884 F.2d at 1141. The Perez court initially wrote that "if Albert did not actually reside in the apartment, the search was illegal under Steagald." 884 F.2d at 1140. After the government’s petition for rehearing, the court modified this standard, adding the emphasized language
if the officers did not have reasonable grounds for believing that Albert resided in the apartment, the search was illegal under Steagald.
900 F.2d at 213, typographical error corrected, 998 F.2d 775 (emphasis added).
Similarly, the court initially wrote:
Unless a jury finds that Albert was an actual co-resident of the apartment, and that the police had reasonable grounds for believing that Albert was in the apartment at the time, the search was in violation of Irma Perez’s constitutional rights.
884 F.2d at 1142 (citation omitted). This was subsequently modified to:
Unless a jury finds that the officers had reasonable grounds for believing that Albert was a co-resident of the apartment, and for believing that Albert was in the apartment at the time, see Payton, 445 U.S. at 603, 100 S.Ct. at 1388, the search was in violation of Irma Perez's constitutional rights. 900 F.2d at 213 (emphasis added).
The actual status of law in the Ninth Circuit is open to question. In United States v. Albrektsen, 151 F.3d 951 (9th Cir.1998) the court recently cited with approval both Route and Risse for the proposition that officers executing an arrest warrant must have “some reason to believe that the defendant might live at and be present within the premises” entered. The court makes no mention of the existence of any higher standard of knowledge.

. While surveillance certainly may bolster a Payton entry, the cases fail to reveal any requirement of substantial prior surveillance of a residence prior to entry. Compare Harper, 928 F.2d at 896, (police conducted “intermittent surveillance”), and Edmonds, 52 F.3d at 1248 (police surveilled apartment complex for less than three hours and saw all the cars depart except for a black Mustang associated with the arrestee), with Lauter, 57 F.3d at 213 (facts suggest no prior surveillance of the residence) and United States v. Beck, 729 F.2d, 1329, 1331-32 (11th Cir.1984) (same).

. One consideration which is not relevant to this determination involves information gained after the entry. Since the focus is the reasonableness of the officers' actions, evidence which is obtained after the entry cannot be used to establish the legality of those actions or, conversely, invalidate an otherwise reasonable entry. Here, for example, when Raymond finally surrendered himself on December 27, 1993, he was asked for his address while he was being booked. He responded by stating that he lived at the Valdez residence in LaPoint. Since this information was not known to the defendants at the time of the entry into the Valdez residence, it cannot retroactively justify the defendants’ conduct.

. The plaintiff suggests an alternative explanation for the pickup’s presence at her house, stating that Tom was a friend of hers, and that the pickup truck was present when Tom came to visit not Raymond Valdez, Jr., but the plaintiff. As with the after-the-fact determination about where Raymond actually lived, the true reason for the pickup truck’s presence is not controlling. Rather, the case must be decided on the basis of what the officers knew at the time of their entry into the residence. Here, there is no evidence McPheters and Littlewhiteman had any reason to take the frequent presence of the white pickup truck as anything other than another indication that the suspect continued to reside in the Valdez house.

. The dissent seeks to minimize these uncon-troverted facts by treating the officers’ conclusion as a single piece of ’’evidence”, when the conclusion itself is grounded on these several facts known by the defendants prior to their first entry. Additionally, although not articulated as such, the dissent seemingly applies a standard much closer to "probable cause” than "reasonable belief.” While probable cause itself is a relatively low threshold of proof, it is a higher standard than “reasonable belief”, which is, as everyone agrees, the appropriate standard. See Alabama v. White, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301, 308 (1990) (noting “the lesser showing required” for reasonable suspicion); Beall v. McGaha, Slip, op., Case No. 96-2095, 1997 WL 234786 (10th Cir.1997) ("satisfaction of the higher probable cause standard necessarily entails satisfaction of the reasonable suspicion standard”).

. It may be noted that even under the "actual presence" test suggested by the Ninth Circuit in Harper, there are grounds for affirming the district court's award of summary judgment. In Harper, the court held that evidence available to the officers supported an entty without a search warrant, although "just barely.” 928 F.2d at 896-97. Specifically, the court noted that the officers knew (1) the suspect’s brothers lived in the residence, (2) according to "an uncorroborated source,” the suspect himself lived there, (3) the police saw automobiles belonging to the suspect's known associates parked at the residence, (4) through "intermittent surveillance” the suspect had been seen entering the residence with his own key during the days prior to the entry, and (5) the suspect had lived with his family at another residence before a previous incarceration "suggesting that he had no independent residence and would resume living with them upon his release.” 928 F.2d at 896. This fact pattern is strikingly similar to the present case. While Valdez was not seen entering the residence "with his own key,” the defendants had been informed of his residence in the house not by "an uncorroborated source" but by Raymond Valdez's own admission, in the presence of Officer Littlewhiteman, that he lived with his mother. Valdez’s family lived in the residence, he was reportedly in the residence in the days prior to the entry, an automobile of a known associate was observed at the residence, and the circumstances of Valdez’s life suggested he would likely be at the residence at the time the officers arrived.