**Karen BRATTON, et al., Plaintiffs,**

**v.**

**Steven TOBOZ, et al., Defendants.**

**No. 1:CV–89–1288.**

United States District Court,
M.D. Pennsylvania.

March 15, 1991.

Allen C. Welch, Thomas A. Thornton, Harrisburg, Pa., for plaintiffs.

Amy Zapp, Deputy Atty. Gen., Harrisburg, Pa., for defendants.

## OPINION

MUIR, District Judge.

### I. INTRODUCTION

On September 6, 1990, the Plaintiffs filed an action pursuant to 42 U.S.C. § 1983 alleging that on October 16, 1987, Defendant Steven Toboz, a Pennsylvania State Trooper, and others conducted an illegal search of a house owned by Plaintiffs Francis and Vera Lowery and resided in by Plaintiff Bratton in violation of their Fourth Amendment rights. Plaintiffs seek an award of compensatory and punitive damages.

This case was tried by the Court sitting without a jury on March 4, 1991. The following are the Court's findings of fact, discussion, and conclusions of law.

### II. FINDINGS OF FACT

1. Plaintiff Karen Bratton is a citizen of the United States who resides at P.O. Box 55, Westport, Pennsylvania, and who resided at that address at all times relevant to this action. (Undisputed, hereinafter "U")

2. Plaintiff Francis Lowery is a citizen of the United States who resides at 148 12th Street, Renovo, Pennsylvania, and who resided at that address at all times relevant to this action. (U)

3. Plaintiff Vera Lowery is a citizen of the United States who resides at 148 12th Street, Renovo, Pennsylvania, and who resided at that address at all times relevant to this action. (U)

4. Francis and Vera Lowery are husband and wife and were married at all times relevant to this action. (U)

5. Defendant Steven Toboz is a citizen of the United States who is employed as a Trooper by the Pennsylvania State Police, and who was so employed at all times relevant to this action. (U)

6. At all times relevant to this action, Trooper Toboz was assigned to the Pennsylvania State Police's Lock Haven Barracks as a criminal investigator. (U)

7. On or about October 10, 1984, there occurred a series of burglaries, arsons and other crimes at hunting camps on Beaverdam Run Road in Clinton County, Pennsylvania. (U)

8. Trooper Toboz was assigned to investigate those occurrences and on January 11, 1985 filed criminal charges against Michael Lowery and three other persons, Patrick Lowery, Timothy Philip Bratton and Dennis Daniel Curran charging them with the October 10, 1984 crimes. (U)

9. Michael Lowery and Patrick Lowery are sons of Francis and Vera Lowery. (U)

10. The same day arrest warrants were issued for all four of these individuals. (U)

11. The home address for Michael Lowery listed on those warrants was 148 12th Street, Renovo, Pennsylvania. (U)

12. Michael Lowery was not residing at that address at the time the warrants were issued in January, 1985 and has not resided at that address at any time since. (U)

13. Michael Lowery has never been apprehended since the issuance in January, 1985 of the warrants for his arrest, and remains a fugitive. (U)

14. Patrick Lowery also was a fugitive at the time warrants for his arrest were issued in January, 1985 and remained so until June 20, 1986 when he was apprehended by Trooper Toboz and other police personnel in Renovo, Pennsylvania. (U)

15. Francis and Vera Lowery jointly own a house and adjacent property in Westport, Pennsylvania, the address of which is P.O. Box 55, Westport, Pennsylvania. (U)

16. That property was previously owned by Francis Lowery's mother, the grandmother of Michael and Patrick Lowery. (U)

17. Beginning in 1986, Karen Bratton has rented the Westport house from Francis and Vera Lowery. (U)

18. Since the date warrants were issued for Michael Lowery, Trooper Toboz and other law enforcement personnel have been engaged in continuing efforts to apprehend him. (U)

19. Similarly, during the period of time during which Patrick Lowery was at large following the issuance of warrants for his arrest, i.e., from January, 1985, until June 20, 1986, Trooper Toboz and other law enforcement personnel engaged in continuing efforts to apprehend him. (U)

20. Since issuance of the arrest warrants for Michael Lowery, the Pennsylvania State Police have conducted numerous surveillances of the Westport house; not once during these surveillances was Michael Lowery observed. (U)

21. In May, 1985, Trooper Toboz and another state trooper went to the Westport house with the arrest warrants which had been issued for Patrick and Michael Lowery to inquire if they were present at that location. (U)

22. The door was answered on that occasion by Karen Bratton who told the troopers that she was present at the Westport house for the purpose of cleaning it. (U)

23. After Bratton informed them that neither Patrick nor Michael Lowery was there and the troopers cautioned Bratton about the possible consequences of harboring fugitives, they left. (U)

24. A short time later the same evening they drove back to the area of the Westport house and stationed themselves off the road in back of a nearby motel which afforded them a view of the house and proceeded to conduct surveillance of it. (U)

25. While the troopers were parked there, Francis Lowery came by and drove over to their car. (U)

26. He proceeded to tell the troopers that he did not want them on the Westport property without a search warrant. (U)

27. On the morning of September 23, 1985, the Pennsylvania State Police at Lock Haven received information that Michael Lowery had just been seen at the Westport house. (U)

28. After that information was relayed to Trooper Toboz and he confirmed it with the informant who supplied it, he proceeded to the office of District Justice Kevin R. Dwyer in Renovo, Pennsylvania, and applied for a search warrant to search the Westport house for Michael Lowery. (U)

29. District Justice Dwyer, however, declined to issue a search warrant, advising Trooper Toboz that it was unnecessary since an arrest warrant had been issued for Michael Lowery and that the arrest warrant and probable cause that Lowery was in the residence to be searched were all that was (sic) needed to conduct the search. (U)

30. Recalling what Francis Lowery had said to the troopers earlier in May, while they were surveilling the Westport house, Trooper Toboz wanted to be sure on this point and therefore proceeded to call Clinton County District Attorney Merritt E. McKnight for advice. (U)

31. Trooper Toboz recounted what had just happened with regard to his attempt to get a search warrant for the Westport residence and the reason the District Justice declined to issue it. (U)

32. Mr. McKnight informed Trooper Toboz that he believed the District Justice's action to be correct; that the arrest warrant for Michael Lowery, along with probable cause to believe he was in the Westport house, was sufficient to conduct a search of it. (U)

33. Trooper Toboz, acting on this advice, then went to the Westport house for the purpose of searching it. (U)

34. Just prior to doing so, he telephoned the Lowerys' residence and explained what he would be doing; he asked if someone would meet him at the Westport house to let him in so that he could avoid using force to gain entry. (U)

35. Francis Lowery met him at the Westport house and proceeded to consent to a search of that property.

36. Michael Lowery was not found during that search. (U)

37. Since the time arrest warrants were issued for Michael Lowery, Trooper Toboz and other members of the Pennsylvania State Police received numerous tips regarding the location of Michael Lowery. (U)

38. Most of the tips received by Trooper Toboz and other Pennsylvania State Police during 1985, 1986, and 1987 indicated that Michael Lowery was living at his parents' Westport house. (U)

39. Many tips received after Bratton had begun residing in the Westport house indicated that Michael Lowery was possibly cohabiting with her at that location. (U)

40. In the period of time after issuance of the arrest warrants for Michael Lowery and prior to the search of the Westport house in October, 1987, Trooper Toboz and other Pennsylvania State Police also received some tips that he was in Massachusetts and Arizona. (U)

41. Based on the reports placing Michael Lowery at the Westport house and the perceived reliability of the sources of same, on October 16, 1987, Trooper Toboz believed that Lowery was using the Westport house as his residence albeit surreptitiously and that he and Bratton were possibly cohabiting.

42. During 1986 and 1987, fugitive Michael Lowery did not reside, live, or co-habit with Karen Bratton at the Westport property.

43. Karen Bratton and the Lowery family have a close relationship.

44. Francis Lowery kept eleven (11) rifles and shotguns in the Westport home and kept chickens on the property.

45. On October 16, 1987, at approximately 1500 hours, Trooper Toboz received a telephone call from an informant who told Trooper Toboz that (as he was driving by the Westport house) he had seen Michael Lowery twice that day, most recently at approximately 1300 hours. Lowery, the informant said, was unloading wood there. (U)

46. The informant said, also, that he knew Michael Lowery, that he was ninety-nine percent (99%) certain that the person he had seen at the house in Westport was Michael Lowery, and provided a description of how that person was dressed, including the fact that the person he saw was wearing a baseball cap backwards, something Toboz had previously learned in his investigation was characteristic of Michael Lowery. (U)

47. The informant was not presented with a photographic lineup to determine whether he could identify Michael Lowery as the person allegedly observed unloading wood at the Westport house on October 16, 1987. (U)

48. In his conversation with Trooper Toboz, the informant did not say that Michael Lowery was living, residing, or cohabiting with Bratton at the Westport house. (U)

49. From his previous visits to the Westport house, Trooper Toboz was aware that it was heated by a wood-burning stove.

50. Trooper Toboz believed the information given him in his telephone conversation with the informant to be consistent with the notion that Michael Lowery was residing at the Westport house.

51. Trooper Toboz reported the information he received from the informant to his superior and that individual decided that action should be taken to search the Westport house for Michael Lowery. (U)

52. The purpose of the search of the Westport house on October 16, 1987, was to apprehend and arrest fugitive Michael Lowery. (U)

53. At the direction of his superior, Trooper Toboz proceeded to coordinate the forthcoming action with other local police

authorities and the other members of the Pennsylvania State Police who would also make up the detail assigned to the search. (U)

54. The detail consisted of one (1) Trooper Toboz and three other Pennsylvania State Police officers (Corporal Martin Salinas, Trooper Miles Houseknecht, and Trooper Robert Paucke) travelling by ground transportation; two (2) other Pennsylvania State Police troopers in a helicopter; three (3) local police officers including Defendants Cannon and Fantasky; and a state game warden. (U)

55. After receiving information from the informant on October 16, 1987 indicating that Michael Lowery was observed at the Westport residence unloading wood, neither Trooper Toboz, nor any other law enforcement officer conducted surveillance of the Westport house or otherwise secured the perimeter of that structure prior to conducting the search. (U)

56. As part of the preparation prior to the departure for the Westport house, Trooper Toboz telephoned District Attorney McKnight, relayed the information he had received, and inquired if a search warrant was necessary. (U)

57. Mr. McKnight told Trooper Toboz that he wanted to do some legal research and would get back to him, both of which he did. (U)

58. Mr. McKnight advised Trooper Toboz that based on his research, no search warrant was necessary; that the arrest warrant for Michael Lowery and probable cause he was at the house in Westport were adequate. (U)

59. Based on this information, and his prior experience in September, 1985, Trooper Toboz did not make any further attempts to obtain a search warrant.

60. No other law enforcement officer involved in the search on October 16, 1987, had a warrant to search the Westport house. (U)

61. Neither Trooper Toboz nor any other law enforcement officer attempted to secure a telephonic search warrant on Oc-

tober 16, 1987, authorizing the search of the Westport house. (U)

62. Trooper Toboz was not faced with exigent circumstances in connection with his search of the Westport home on October 16, 1987. (U)

63. Neither Trooper Toboz nor any other law enforcement officer received consent to search the Westport house on October 16, 1987, prior to doing so. (U)

64. The detail proceeded to the Westport house where its members all arrived at about the same time, approximately 1730 hours. (U)

65. Approximately 2½ hours had elapsed on October 16, 1987, from the time Trooper Toboz had first received information from the informant indicating that Michael Lowery was observed at the Westport house and the time that the actual search of the residence began. (U)

66. Only one of the plaintiffs, Karen Bratton, was present there while the search was being conducted; Francis and Vera Lowery did not arrive until after the search of the house had been completed. (U)

67. On their arrival, Troopers Toboz, Houseknecht and Corporal Salinas all went over to Bratton who was outside the house on one side of it and told her they were going to search the house. (U)

68. Karen Bratton told the troopers that they were not to enter the house until she called Francis Lowery for instructions. (U)

69. The troopers did not comply with Bratton's instructions and proceeded to enter the house along with Bratton. (U)

70. Bratton told the officers that she was going to call Francis Lowery and did so. (U)

71. All other members of the police detail remained outside the structure and never entered it; the troopers in the helicopter never landed on the property but remained airborne. (U)

72. The helicopter hovered above the Westport house while the search was being

conducted, and departed shortly thereafter. (U)

73. Upon entering the house, the three (3) Pennsylvania State Police officers performed a room-by-room search of the first floor. (U)

74. When that was completed, Corporal Salinas and Trooper Toboz went upstairs to the second floor and similarly conducted a room-to-room search. (U)

75. Trooper Houseknecht remained downstairs with Bratton. (U)

76. Bratton never observed what took place during the search of the second floor.

77. In the course of conducting the search, Trooper Toboz only searched places in which an individual could conceal himself.

78. He did not look in drawers or cupboards into which a person could not fit.

79. Because the Pennsylvania State Police had received information that there might be a trap-door at the Westport house, they checked the rug which was covering the floor in that room.

80. In the course of the search, furniture behind which an individual could hide was moved but was replaced.

81. During the search inside the Bratton home on October 16, 1987, State Police officers damaged one piece of molding.

82. The search was completed in approximately 20–30 minutes. (U)

83. Because of the presence of the helicopter and the State Police vehicles, numerous individuals living in the surrounding community were observing the October 16, 1987, search.

84. Michael Lowery was not found in the Westport house. (U)

85. Francis Lowery was visibly angry with Trooper Toboz, obtained from the dwelling a long gun, and had to be restrained by his family from using it.

86. Karen Bratton was frightened and intimidated by the presence of armed law enforcement officers searching her home.

87. Karen Bratton suffered anger and humiliation as a result of law enforcement officers disturbing her privacy and searching her home.

88. Karen Bratton's co-workers at her job questioned her about the October 16, 1987, search, causing her substantial humiliation and embarrassment.

89. As the result of the October 16, 1987, search, rumors began circulating in the Westport and Renovo communities that Karen Bratton was hiding a fugitive; this caused Karen Bratton mental distress and anguish.

90. Karen Bratton's social life deteriorated substantially after the October 16, 1987, search. Karen Bratton would not visit bars or go to dances because of questions about her alleged involvement with fugitive Michael Lowery.

91. None of the Plaintiffs has received any kind of care or treatment for any type of problem as the result of the search.

92. None of the plaintiffs has incurred any type of expenses for medical or other treatment as the result of the search.

### III. DISCUSSION

On October 16, 1987, Stephen Toboz was contacted by a confidential informant who told him that he saw Michael Lowery, a fugitive wanted on charges related to a string of crimes committed in 1984, unloading wood that morning at a home owned by Lowery's parents, Francis and Vera Lowery, and resided in by Karen Bratton. Trooper Toboz believed that the tip corroborated earlier tips that Lowery was residing at the Westport home, and possibly was cohabiting with Karen Bratton there. That afternoon, Toboz and other police officers conducted a search of the Westport home pursuant to an arrest warrant issued for Michael Lowery but without a search warrant for the Westport home. Michael Lowery was not found during the search and probably did not in fact reside in the house.

Plaintiffs argue that the warrantless search was unconstitutional and caused mental distress to Karen Bratton and caused minor physical damage to the property searched. Plaintiffs seek compensatory and punitive damages pursuant to 42 U.S.C. § 1983. Toboz argues that the

search did not violate Plaintiffs' Fourth Amendment rights because Toboz reasonably believed the Westport home to be Michael Lowery's residence and possessed a valid arrest warrant for Michael Lowery. Toboz further argues that even if the search was unconstitutional, he is entitled to qualified immunity from damages. We shall first address the issue of the constitutionality of the search.

■ Absent consent or exigent circumstances, entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). If, however, officials possess an arrest warrant founded on probable cause, they may enter a house in which the suspect lives when there also is reason to believe the suspect is within. *Id.* at 603, 100 S.Ct. at 1388. Officials may not, however, enter the residence of a third party in the belief that the fugitive they seek may be inside absent a valid search warrant. *Steagald v. United States*, 451 U.S. 204, 212, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1981). The Court in *Payton* noted that "physical entry of the home is the chief evil" against which the Fourth Amendment was intended to guard. 445 U.S. at 585, 100 S.Ct. at 1379. In *Steagald*, a § 1983 action, the Court assumed police had probable cause to believe the fugitive was a guest in the home searched. 451 U.S. at 213, 101 S.Ct. at 1648. Noting that allowing the police to determine whether probable cause existed to search the home of a third party pursuant to a valid arrest warrant did not provide enough protection to the third party, the Court emphasized the importance of placing a neutral magistrate between the police and the citizenry, *Id.* at 211, 101 S.Ct. at 1647, and expressed its concern that a valid arrest warrant could be used by police to search the homes of a suspect's friends and acquaintances. *Id.* at 215, 101 S.Ct. at 1649. Under *Payton* and *Steagald*, therefore, entry into a residence without a search warrant is impermissible unless the search is consensual, under exigent circumstances, or into a suspect's own home pursuant to a valid arrest warrant and with reason to believe the suspect is inside. *Payton*, 445 U.S. at 602, 100 S.Ct. at 1387.

The Plaintiffs contended that *Steagald* is controlling and argue that the address of Michael Lowery which appears on the arrest warrants issued in January, 1985 as that of his parents in Renovo, Pennsylvania, precludes Toboz from now asserting that Michael Lowery was residing in the Westport house owned by his parents. Toboz argues that Michael Lowery has not lived in his parents' home since the warrant for his arrest was issued. During that time the Pennsylvania State Police received information that Michael Lowery was cohabiting with Bratton in the Westport house and Toboz argues that it therefore was reasonable to believe that the Westport house was his "residence" for purposes of the *Payton* exception to the search warrant requirement.

In a dissenting opinion in *Steagald*, Justice Rehnquist noted the difficulties created by the *Payton* exception to the search warrant requirement:

> If a suspect has been living in a particular dwelling for any significant period, say a few days, it can certainly be considered his "home" for Fourth Amendment purposes, even if the premises are owned by a third party and others are living there, and even if the suspect concurrently maintains a residence elsewhere as well. In such a case the police could enter the premises with only an arrest warrant.

*Steagald*, 451 U.S. at 230–31, 101 S.Ct. at 1656–57 (Rehnquist, J., dissenting). This case presents a situation which falls between *Payton* and *Steagald*. Based on the tips which the Pennsylvania State Police had received during 1986 and 1987, Toboz believed that Michael Lowery was residing surreptitiously at the Westport house. Toboz's belief was in fact incorrect. The issue, therefore, is whether a reasonable belief that a suspect named in an arrest warrant has taken up residence in the home of a third party falls within the *Payton* exception to the warrant requirement.

The Court of Appeals for the Ninth Circuit, in cases not cited by the parties, has held that if a suspect for whom a valid arrest warrant exists is a co-resident of the third party whose home is searched, *Payton* renders the search permissible. *See United States v. Litteral*, 910 F.2d 547, 553–54 (9th Cir.1990); *Perez v. Simmons*, 884 F.2d 1136, 1140 (9th Cir.1989), *modified*, 900 F.2d 213 (9th Cir.1990); *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir.1987). In *Perez*, a § 1983 action, the court held that a police search of the home of a third party in which the subject of a valid arrest warrant was not found, was permissible under *Payton* and *Steagald* if the police had reasonable grounds for believing that the subject resided in the apartment. *Perez*, 900 F.2d at 213. Police believed that the subject of a valid arrest warrant, Albert Perez, "occasionally spent the night" at the residence of his sister, Irma. *Id.*, 884 F.2d at 1141. The court refused to view the home as Albert Perez's residence and held that the lower court erred in instructing the jury that the third party's residence could be considered the suspect's home even if the suspect did not in fact permanently reside there. However, upon rehearing, the court remanded the case to the lower court with the instruction that:

"Unless a jury finds that the officers had reasonable grounds for believing that Albert was a co-resident of the apartment, and for believing that Albert was in the apartment at the time, *see Payton*, 445 U.S. at 603, 100 S.Ct. at 1388, the search was in violation of Irma Perez's constitutional rights."

900 F.2d at 213. The court thus held that the Fourth Amendment rights of the third party were not violated if police reasonably believed that the subject of the arrest warrant was a co-resident of the house searched. *Id.*

■ Here, based on the tip received on the morning of October 16, 1987, Toboz believed that Michael Lowery was present unloading wood at the Westport home that day. Toboz testified that the informant was reliable. Toboz knew that the house was heated by a wood burning stove and that people in the area commonly began stocking firewood at that time of year. Toboz's belief that Lowery was inside was reasonable. Based on previous tips, he believed that Lowery was a co-resident with Bratton of the Westport home. It is our view that Toboz's belief that Lowery was residing at the Westport home, although not in fact correct, was reasonable. Despite the fact that surveillance of the Westport house had been unsuccessful, the volume of anonymous tips and the fact of Karen Bratton's close relationship with the Lowerys rendered such a belief reasonable. We therefore conclude that the search of the Westport house on October 16, 1987, did not violate the Fourth Amendment.

■ Because Toboz believed reasonably that Lowery was a co-resident at the Westport house, Plaintiffs' Fourth Amendment rights were not violated even though Lowery was not in fact a resident there. However, even if the search had been defective under *Steagald*, we are of the view that Toboz would be entitled to qualified immunity from damages.

The Supreme Court set forth the standard by which the doctrine of qualified immunity must be evaluated, stating:

We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established or constitutional rights of which a reasonable person would have known.... If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. (Citations omitted).

*Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1981).

Recently, in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1986), the Supreme Court further explained that the examination of whether a search was objectively legally reasonable "will often require examination of the information possessed by the searching offi-

cials...." *Id.* at 641, 107 S.Ct. at 3039. The inquiry therefore is whether a reasonable officer could have believed the search to be lawful "in light of clearly established law and the information the searching officers possess." *Id.* The officer's subjective beliefs are irrelevant. *Id.* The Court of Appeals for the Third Circuit, in *Good v. Dauphin County Social Services*, 891 F.2d 1087 (3d Cir.1989) stated:

> The ultimate issue is whether, despite the absence of a case applying established principles to the same facts, reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful. Second, even where the officials clearly should have been aware of the governing legal principles, they are nevertheless entitled to immunity if based on the information available to them they could have believed their conduct would be consistent with those principles.

*Id.* at 1092.

First, although in our view the legal principles set forth in *Steagald* and *Payton* are "clearly established," courts have held that a person arrested pursuant to a valid arrest warrant in the home of a third party possesses "no greater right of privacy in another's home than in his own" and may not challenge the warrantless search. *United States v. Underwood*, 717 F.2d 482, 483 (9th Cir.1983). In that case, the Court of Appeals for the Ninth Circuit held that although the third party whose home was searched possessed a right of privacy protected by *Steagald*, the person arrested had no constitutional claim. *Id.* at 486. *See also Commonwealth v. Stanley*, 498 Pa. 326, 446 A.2d 583, 586–87 (1982) (holding that arrest pursuant to valid arrest warrant in home of third party did not violate Fourth Amendment rights of arrestee).

Furthermore, Toboz relied on the advice of Clinton County District Attorney Merritt E. McKnight that the arrest warrant for Michael Lowery, along with probable cause to believe that he was in the Westport house, was sufficient to conduct a search of it. On September 23, 1985, Toboz sought to obtain a search warrant from District Justice Kevin R. Dwyer to search the Westport house for Michael Lowery. District Justice Dwyer advised Toboz that a search warrant was unnecessary because an arrest warrant and probable cause that Lowery was in the residence were sufficient to conduct the search. On October 16, 1987, Toboz again sought the advice of McKnight, who researched the issue and again advised Toboz that no search warrant was necessary. Toboz thus "sought an expert legal opinion" before acting. *See Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 888 (9th Cir.1990). *See also Lee v. Mihalich*, 847 F.2d 66, 71–72 (3d Cir.1988) (holding that seeking legal opinion from an attorney constitutes "information otherwise available" in an assessment of the objective legal reasonableness of official actions). Therefore, based on the state of the law at the time, and the information available to Toboz, Toboz's actions were reasonable, and Toboz is entitled to qualified immunity from damages.

## IV. CONCLUSIONS OF LAW

1. On October 16, 1987, Trooper Toboz had a reasonable belief that the Westport house was being used by Michael Lowery as his residence.

2. The search without a search warrant but with an arrest warrant conducted by him that day was constitutional.

3. On the particular facts of this case, a reasonable police officer could have believed that a search without a search warrant but with an arrest warrant of the Westport house was legal.

4. Defendant Toboz is entitled to qualified immunity with respect to Plaintiffs' claim that the warrantless search of the Westport house was improper.

5. Plaintiffs are not entitled to any relief, including any award of damages.