F I L E D
United States Court of Appeals
Tenth Circuit

JUL 2 2003

PATRICK FISHER
Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

  Plaintiff-Appellant,

v.

KENT NELSON THOMPSON,

  Defendant-Appellee.

No. 02-4022
(D. Utah)
(D.Ct. No. 00-CR-318C)

**ORDER AND JUDGMENT**[*]

Submitted on the briefs.[**]

Paul M. Warner, United States Attorney, and Wayne T. Dance, Assistant United States Attorney, Salt Lake City, Utah, for Plaintiff-Appellant.

Stephanie Ames, and Gregory G. Skordas, Salt Lake City, Utah, for Defendant-Appellee.

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Before **SEYMOUR**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **BRISCOE**, Circuit Judge.

---

Appellee Kent Nelson Thompson was indicted by a federal grand jury on four counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Mr. Thompson moved to suppress evidence obtained when law enforcement agents searched his home for a third party fugitive. After evidentiary hearings and oral argument, the district court granted the motion. On appeal, the government challenges this ruling. We exercise jurisdiction pursuant to 18 U.S.C. § 3731 and affirm.

**Factual Background**

Federal Bureau of Investigation agents received information from a county sheriff's deputy that Ronald Baldwin, a fugitive, was presently at a Salt Lake City home. The agents confirmed Mr. Baldwin had outstanding arrest warrants for violating parole supervision. Their review of Mr. Baldwin's criminal history revealed drug offenses, parole violations, and assaults.

Two agents went to the house to gather more information. While surveilling the house, they observed Mr. Baldwin exit the garage, walk to the curb, and then re-enter the house. The agents also saw a man, later identified as

-2-

Mr. Thompson, leave the house.

Having confirmed Mr. Baldwin's presence at the home, eight to ten agents set up a perimeter around the property to execute the arrest warrant and prevent Mr. Baldwin from escaping. Shortly after their arrival, they apprehended a man as he tried to flee the house. The man told the agents several people were still inside and provided a phone number to the house. The agents made a number of phone calls to the home requesting that everyone inside exit with their hands up. Several people came out of the house, but Mr. Baldwin remained inside.

At some point during the stand-off, Mr. Thompson returned to the house. He angrily informed the agents the house was his and asked what was happening. Mr. Thompson indicated Mr. Baldwin was inside the home. He also said there was a loaded .357 handgun in the vest of a jacket in the closet and a single shot .22 caliber pistol in a large, unlocked gun safe. Mr. Thompson assisted the agents in diagraming the layout of the house, indicating the location of the weapons and potential hiding places large enough for a person. The agents did not obtain Mr. Thompson's permission to search the house, nor did they get a search warrant for the house. At this point, none of the agents knew Mr. Thompson was a felon.

About two hours after setting up the perimeter, the agents called a special weapons and tactics team. The agents called the team because Mr. Baldwin had a dangerous criminal history, had access to firearms, and was barricaded inside the house.

Using the information Mr. Thompson provided, the special weapons and tactics team entered the house. In the basement, they observed the large gun safe Mr. Thompson described. The safe door was ajar. The agents opened it further and observed firearms in the safe. The team eventually found Mr. Baldwin in the basement, hiding in a pile of laundry.

The agents took Mr. Baldwin into custody, then re-entered the house. They seized four firearms, including the guns in the safe and the gun Mr. Thompson described as being in a vest pocket. They also seized ammunition and drug paraphernalia.

Based on the firearms found in the house, a grand jury indicted Mr. Thompson on four counts of possessing a firearm as a previously convicted felon in violation of 18 U.S.C. § 922(g)(1). Each count involved a separate firearm.

Mr. Thompson filed a motion to suppress the firearms.[1] After briefing by the parties and evidentiary hearings, the district court granted Mr. Thompson's motion. In pertinent part, the court held the plain view doctrine, allowing a limited warrantless seizure, did not apply because the incriminating character of the firearms was not immediately apparent to the agents. The court also held no exigent circumstances justified the agents' second entry into the house and seizure of the firearms after Mr. Baldwin was in custody.

The government appeals the district court's suppression of the firearms, arguing the search and seizure were permissible under the plain view doctrine because the criminal nature of the firearms was readily apparent. Alternatively, the government claims the agents could seize the firearms during their protective sweep of the house.

**Discussion**

"On appeal of a motion to suppress, we accept the district court's factual findings unless clearly erroneous and view the evidence in the light most

---

[1] Although Mr. Thompson's motion to suppress sought to exclude "the evidence obtained at [the home]," the district court later clarified the motion only concerned the guns. Likewise, this appeal and our decision only concern the admissibility of the firearms.

favorable to the prevailing party, here [Mr. Thompson]." *United States v. De la Cruz-Tapia,* 162 F.3d 1275, 1277 (10th Cir. 1998). "'A finding of fact is "clearly erroneous" if it is without factual support in the record or if [we], after reviewing all the evidence, [are] left with a definite and firm conviction'" the district court erred. *Manning v. United States*, 146 F.3d 808, 812 (10th Cir. 1998) (quoting *Cowles v. Dow Keith Oil & Gas, Inc.*, 752 F.2d 508, 511 (10th Cir. 1985), *cert. denied,* 479 U.S. 816 (1986)). We review legal questions, such as "[t]he ultimate determination of reasonableness under the Fourth Amendment[,] ... de novo, considering the totality of the circumstances." *United States v. Dickerson,* 195 F.3d 1183, 1186 (10th Cir. 1999). *See also United States v. Holt*, 264 F.3d 1215, 1228 (10th Cir. 2001) (en banc).

**Plain View Doctrine**

The government argues the agents did not violate the Fourth Amendment in seizing the firearms. It believes the agents properly seized the firearms under the plain view doctrine because the criminal nature of the firearms was readily apparent. It claims the record shows "[o]fficers could reasonably infer that [Mr.] Baldwin knowingly had access to and joint and constructive possession of the firearms." Thus, the government believes the district court should not have suppressed the firearms.

In ruling on the motion to suppress, the district court rejected the government's plain view theory of this case. The court found "no evidence that [Mr.] Baldwin ever possessed any of the [firearms]." Thus, the court concluded there "was no basis to find that the incriminating character of the guns ... was immediately apparent." After reviewing the record, we conclude it supports the district court's factual findings.

The Fourth Amendment guarantees "[t]he right of the people to be [free from] unreasonable searches and seizures." U.S. Const. amend. IV. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586 (1980) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 474-75, 477-78 (1971)). Agents may, however, seize evidence without a warrant if it is in "plain view." *Coolidge*, 403 U.S. at 465. An object is in plain view if: (1) "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed"; (2) the item's "incriminating character [was] immediately apparent"; and (3) the officer had "a lawful right of access to the object itself." *Horton v. California,* 496 U.S. 128, 136-37 (1990). In this instance, we need not address all three factors of the plain view analysis because we conclude the criminal nature of the firearms was not immediately

apparent. *See id.* (holding all three conditions must be present to justify a warrantless seizure under the plain view doctrine).[2]

"An item's incriminating nature is immediately apparent if the officer had probable cause to believe the object was contraband or evidence of a crime." *United States v. Castorena-Jaime*, 285 F.3d 916, 924 (10th Cir. 2002) (quotation marks and citations omitted). "A seizing officer need not know or have an unduly high degree of certainty as to the incriminatory character of the evidence under the plain view doctrine. All that is required is a practical, nontechnical probability that incriminating evidence is involved." *Id.* (quotation marks and citations omitted).

The government argues the agents had probable cause to believe Mr. Baldwin, as a known felon and fugitive, constructively possessed the firearms. *See* 18 U.S.C. § 922(g)(1) and (2) (prohibiting a felon or fugitive from possessing firearms). In this case, it is clear Mr. Baldwin was a known felon and fugitive. Thus, the question is whether the agents could reasonably believe Mr. Baldwin

---

[2] The government also argues the agents met the first factor necessary for a plain vew seizure because they properly entered the house. Since we are able to reject the plain view argument solely on the basis the criminal nature of the firearms was not readily apparent, we offer no opinion as to whether the initial entry was proper.

constructively possessed the weapons.

A person has constructive possession of a firearm if he "knowingly holds the power to exercise dominion or control over the firearm." *United States v. Heckard*, 238 F.3d 1222, 1228 (10th Cir. 2001) (citing *United States v. Mills*, 29 F.3d 545, 549 (10th Cir. 1994)). "[W]here there is evidence of joint occupancy [of the area where agents found a weapon], the Government must offer 'evidence supporting at least a plausible inference that the [person] had knowledge of and access to the weapon.'" *United States v. Hein Van Tieu*, 279 F.3d 917, 922 (10th Cir. 2002) (quoting *Heckard*, 238 F.3d at 1228).

Here, the government argues the agents "could reasonably infer" Mr. Baldwin had knowledge of and access to the firearms. With respect to Mr. Baldwin's access to the firearms, one agent testified Mr. Thompson said Mr. Baldwin had access to the firearms. Based, in part, on this testimony, the district court concluded Mr. Baldwin had access to the firearms in the house. On appeal, Mr. Thompson does not dispute this factual finding. Access alone, however, is not enough to establish constructive possession. *See Mills*, 29 F.3d at 550. We must ask whether there is "evidence to support an inference that [Mr. Baldwin] was aware of the firearms contained in the [house]." *Id*. The government directs

us to several facts it claims support the inference Mr. Baldwin had knowledge of the firearms. We address each of these facts in turn.

First, the government points to one agent's testimony stating he "received information ... the fugitive knew that there was a firearm inside the house." However, this agent was positioned on the south and west sides of the house and did not directly speak with Mr. Thompson, who had informed the agents about the firearms in the house. Instead, he received the information about the firearms from another officer at the scene via radio or cellular telephone. In addition to this agent's testimony, the district court heard from the agent who interviewed Mr. Thompson. The interviewing agent testified Mr. Thompson told him Mr. Baldwin had access to the firearms, but he did not mention whether Mr. Thompson told him Mr. Baldwin knew about the firearms. Similarly, another agent who witnessed Mr. Thompson's interview did not include anything about Mr. Baldwin's supposed knowledge of weapons in his summary of the conversation.[3] Presented with the testimony of these two other agents with more direct information, we cannot conclude the district court erred in discounting the

_____

[3] In its reply brief, the government urges us to find constructive possession based on "[Mr.] Thompson's statement that [Mr.] Baldwin knew about the firearms and had access to them." As explained above, our own review of the record reveals no evidence Mr. Thompson ever told agents Mr. Baldwin knew about the firearms.

testimony of the agent whose only source of information was another officer. *See United States v. Fernandez*, 18 F.3d 874, 876 (10th Cir. 1994) (emphasizing "the credibility of the witnesses and the weight given to the evidence ... are matters for the trial judge").

The government also claims the fact Mr. Baldwin was living in the house suggests he had knowledge of the firearms. However, the district court determined "it was not reasonable for law enforcement officers to believe that [Mr.] Baldwin was a resident of the home."[4] The government urges us to overturn the district court's corresponding finding that "[n]o evidence was offered that demonstrates [Mr.] Baldwin was a resident of the home." In furtherance of its argument, the government points to testimony stating Mr. Thompson told one agent Mr. Baldwin "was living there." The government also argues the agents could infer Mr. Baldwin resided in the house from the fact "local authorities indicated that [Mr.] Baldwin [was] at the house," and from the fact Mr. Baldwin "remained in the house for several hours [while Mr.] Thompson ... was absent."

---

[4] The government briefed, and the district court considered, the issue of Mr. Baldwin's residence in the context of whether the government's initial entry to the house was permissible. Although our disposition of this case does not require us to address whether the initial entry was permissible, the government referred to Mr. Baldwin's residence in its constructive possession argument, and we therefore consider it now.

-11-

The record supports the district court's conclusion it was not reasonable for agents to believe Mr. Baldwin lived at the house. For example, when asked if he had "any real information beforehand as to who the owner [was] or who was living [at the house]," an agent answered, "[n]o, we didn't. We just had information that Ronald Baldwin was at that address." Similarly, when asked if he was "able to verify who actually resided in the home," another agent testified he received information verifying Mr. Thompson was residing at the home, but notably did not mention having information about Mr. Baldwin residing there. Yet another agent testified the agents knew Mr. Baldwin was "at the residence," making no reference to him residing there. In addition, the fact several other individuals exited the home in response to the agents' requests casts doubt on the government's contention it was reasonable to infer Mr. Baldwin lived at the residence from his presence there. In light of these facts, we see no reason to disturb the district court's conclusion it was not reasonable for the agents to believe Mr. Baldwin lived at the house. Thus, the district court did not err in rejecting Mr. Baldwin's alleged residency as evidence he had knowledge of the firearm.

Finally, we are not persuaded by the government's argument Mr. Baldwin had knowledge of the firearms because he was found in "close proximity" to

them. When a felon is found in "close proximity" to a firearm there is sufficient evidence to establish the felon knew about the weapon and constructively possessed it. *United States v. Wright*, 932 F.2d at 868, 881 (10th Cir.) (upholding a felon in possession of a firearm conviction when agents found a rifle within eight feet of the defendant), *cert. denied,* 502 U.S. 962 and 502 U.S. 972 (1991). Here, however, the record does not show agents found Mr. Baldwin in close proximity to the weapons. Rather the testimony establishes the agents found Mr. Baldwin in a *room* "in close proximity" to the *room* containing the safe. Our search of the record did not reveal any evidence Mr. Baldwin ever occupied the room containing the safe. Further, an agent testified when they found the safe, it was "closed to the extent that you could not see what was inside of it." This makes it unlikely Mr. Baldwin would have known about the weapons simply from his presence in the laundry room. Lastly, we note the district court was in a far better position to judge Mr. Baldwin's proximity to the firearms than we are now. It reviewed evidence not before us, including a diagram of the house showing where agents found both Mr. Baldwin and the firearms. Presented with this evidence, the district court nevertheless concluded there was no evidence Mr. Baldwin possessed the firearms. On these facts, we will not substitute our judgment for that of the district court. *See Fernandez*, 18 F.3d at 876.

After carefully reviewing the record and considering the evidence in the light most favorable to Mr. Thompson, we are not left with the "definite and firm conviction," *Manning*, 146 F.3d at 812 (citation omitted), the district court erred in finding there was no evidence Mr. Baldwin possessed the firearms. Consequently, the criminal nature of the firearms was not readily apparent. We affirm the district court's decision the plain view doctrine did not justify the agents' seizure of the firearms.[5]

**Protective Sweep**

The government next argues the agents could properly seize the firearms in the course of a protective sweep while executing Mr. Baldwin's arrest warrant because the firearms posed a security risk to the agents. It argues:

> It is a logical, reasonable and even necessary extension of the protective sweep doctrine that where firearms are discovered in a residence during the execution of an arrest warrant, and while a simultaneous protective sweep of the house for officer safety is also underway, officers can lawfully seize any weapons and remove them from the residence for officer safety.

The government also contends "[i]f ... the officers could have properly seized the

_____

[5] The government also argues "the officers could immediately re-enter the residence to seize firearms which had just been observed in plain view without obtaining a search warrant." We need not address this argument because, as previously discussed, the firearms were not in plain view when the agents entered the home.

-14-

weapons prior to locating [Mr.] Baldwin, or at the same time they arrested him and brought him out of the residence[,] ... there should be no constitutional barrier to the officers prudently performing the two operations in rapid succession." We reject these arguments.

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). To conduct a protective sweep, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334. "The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36. We note "[o]fficers of the law are not given free reign to conduct sweep searches on the pretense that a dangerous situation might be imminent." *United States v. Tabor*, 722 F.2d 596, 598 (10th Cir. 1983).

After considering the record in light of the applicable law, we conclude the agents were not conducting a protective sweep when they seized the firearms.

Assuming the agents could legitimately conduct a protective sweep of the house while apprehending Mr. Baldwin, that sweep should have ended once the agents had the opportunity to "complete the arrest and depart the premises." *Buie*, 494 U.S. at 336. Yet the record reflects the agents re-entered the house to seize the weapons after they arrested Mr. Baldwin, removed him from the home, and took him to an adult detention center. Consequently, it is clear the agents' seizure of the weapons was not part of the protective sweep conducted during the execution of Mr. Baldwin's arrest warrant.

The government nevertheless claims agents may continue a protective sweep after the arrest if the agents reasonably believe the sweep will lessen the danger. In support of this argument, the government cites two Tenth Circuit cases: *United States v. Flores*, 149 F.3d 1272 (10th Cir. 1998), *cert. denied,* 525 U.S. 1092 (1999), and *United States v. Tisdale*, 921 F.2d 1095 (10th Cir. 1990), *cert. denied,* 502 U.S. 986 (1991). We conclude *Flores* and *Tisdale* do not control the outcome of the present case.

Flores is not helpful because Mr. Flores "[did] not contest the propriety of the protective sweep." *Flores*, 149 F.3d at 1278. Consequently, the *Flores* court did not decide whether the sweep was proper.

*Tisdale* is similarly unpersuasive. In *Tisdale*, officers executing an arrest warrant conducted a protective sweep in a house after they "saw the defendant flee out the window and heard three gunshots." *Tisdale*, 921 F.2d at 1097. On appeal, the defendant argued "no reasonable person could perceive danger after watching him flee." *Id.* The court held a protective sweep was not unreasonable because "[g]iven defendant's actions and background it was not unreasonable for [the officers] to believe that other dangerous people might be present or that defendant would return." *Id.* In the case before us, the agents had no reason to believe other dangerous people were in the house. People who exited the house prior to Mr. Baldwin's arrest told agents "everybody [was] out of the house but [Mr.] Baldwin." The special weapons and tactics team then entered the house to arrest Mr. Baldwin. In looking for Mr. Baldwin, they conducted an exhaustive search of the house, but did not find anyone other than Mr. Baldwin. They arrested Mr. Baldwin and removed him from the premises. At this time, there was no reason to believe any other dangerous people were inside the home. Hence, *Tisdale* does not support the agents' seizure of the firearms in this case.[6]

---

[6] The government also cites *United States v. Hernandez*, 941 F.2d 133 (2d Cir. 1991), and *United States v. Caraza*, 843 F.2d 432 (11th Cir. 1988). These cases are inapplicable because, like *Flores*, they involve factual situations where the officers had reason to believe other people in the house were a threat to officer safety. *See Hernandez*, 941 F.2d at 135, 137 (upholding protective sweep search under a mattress when officer intended to place handcuffed woman on the bed); *Caraza*, 843 F.2d at 436 (upholding protective sweep when officer "could not be certain whether others were in the house

In sum, we conclude any protective sweep incident to Mr. Baldwin's arrest, on these facts, could not extend beyond the time the agents took Mr. Baldwin to the adult detention center.  Because we conclude the agents were not justified in conducting a protective sweep at the time they seized the firearms, we need not reach the question of whether agents may properly seize firearms during a protective sweep absent application of the plain view doctrine.

**Conclusion**

For the foregoing reasons, we **AFFIRM** the district court's suppression of the firearms as evidence against Mr. Thompson.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge

---

who might ... pose a threat to the officers").