FILED
United States Court of Appeals
Tenth Circuit

December 30, 2014

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENT CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 13-3329

STEVEN J. DENSON,

Defendant-Appellant.

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:13-CR-10111-MLB-1)**

Timothy J. Henry, Assistant Federal Public Defender, Wichita, Kansas, for Defendant-Appellant.

Matthew T. Treaster, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with him on the brief), Wichita, Kansas, for Plaintiff-Appellee.

Before **TYMKOVICH**, **EBEL**, and **GORSUCH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

Steven Denson was on the lam. After his conviction for armed robbery and a spell in prison he quit reporting to his probation officer as his sentence required. For a time, Mr. Denson appeared gone for good. But authorities weren't quick to

give up their search and eventually they found his name on a residential Wichita utility account. With an arrest warrant in hand they showed up at the listed address. When a handheld Doppler radar device and other evidence suggested Mr. Denson might be present inside the house, the officers entered. Quickly they found Mr. Denson along with a stash of guns, guns he lacked the right to possess by virtue of his felony conviction.

This led Mr. Denson to plead guilty to a federal firearm charge under 18 U.S.C. §§ 922(g)(1) and 924(a)(2). At the same time, he preserved the right to appeal the district court's denial of his Fourth Amendment motion to suppress. Exercising that right now, he seeks reversal on three grounds. First, he contends the officers entered his home without reason to believe he was there at the time. Second, he argues that the officers lacked a lawful basis to search his home after they arrested him. Third, he submits that the officers had no right to seize his guns even after they came upon them. In the first two of these questions we confront — even if we do not have to resolve fully — how the Fourth Amendment interacts with the government's use of radar technology to peer inside a suspect's home.

The Supreme Court has held that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980). But how much proof must the government

amass to establish "reason to believe" a suspect may be found "within" a house at the time of its search? Is that formula meant to parallel the familiar probable cause standard generally applicable to arrests? Or does *Payton* mean to invoke something closer to the more forgiving reasonable suspicion standard we use for investigatory detentions?

The circuits disagree. Some, this one included, have read *Payton* to require something less than probable cause. *See Valdez v. McPheters*, 172 F.3d 1220, 1227 n.5 (10th Cir. 1999); *United States v. Thomas*, 429 F.3d 282, 286 (D.C. Cir. 2005), *modified on other grounds*, 179 F. App'x 60 (2006) (per curiam); *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir. 1995). The logic behind these decisions is simple enough: "the Supreme Court in *Payton* used a phrase other than 'probable cause' because it meant something other than 'probable cause.'" *Thomas*, 429 F.3d at 286. Meanwhile, other circuits have held that *Payton*'s "reason to believe" standard "embodies the same standard of reasonableness inherent in probable cause." *United States v. Gorman*, 314 F.3d 1105, 1112 & n.6 (9th Cir. 2002); *see also United States v. Hardin*, 539 F.3d 404, 416 n.6 (6th Cir. 2008); *United States v. Barrera*, 464 F.3d 496, 501 (5th Cir. 2006); *United States v. Magluta*, 44 F.3d 1530, 1534-35 (11th Cir. 1995). Indeed, the Supreme Court itself has sometimes seemed to employ the term "reasonable ground for belief" as part of the very definition of "probable cause." *See, e.g.*, *Maryland v. Pringle*,

540 U.S. 366, 371 (2003) (discussing *Brinegar v. United States*, 338 U.S. 160, 175 (1949)); *see also United States v. Jackson*, 576 F.3d 465, 469 (7th Cir. 2009).

In this light, one might wonder if reason exists to reconsider *Valdez*. But in our case we don't need to pursue the question because nothing turns on its answer. Even if the officers needed probable cause to think Mr. Denson was inside the home at the time of their entry, they had it. Probable cause doesn't require proof that something is more likely true than false. It requires only a "fair probability," a standard understood to mean something more than a "bare suspicion" but less than a preponderance of the evidence at hand. *See United States v. Ludwig*, 641 F.3d 1243, 1252 & n.5 (10th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). When assessing whether the government meets the probable cause standard we look to the "totality of the circumstances." *See Ludwig*, 641 F.3d at 1248. And the combination of facts known to the officers in this case gave them reason enough to suppose that Mr. Denson could be found inside his home at the time they entered.

First, Mr. Denson had recently opened a utility account for the Wichita home, he was the primary account holder, and, as far as the officers knew, he didn't have another residence. True, none of this guarantees his presence in the house at any particular time. But the fact that Mr. Denson held a utility account at the house and officers hadn't turned up any other address for him goes at least some way to suggesting he might be there rather than someplace else.

Second, the police knew that Mr. Denson hadn't reported any recent earnings. This suggested, even if it didn't show, he was out of work at the time of the search — all the more reason why he might be at home when they visited, around 8:30 a.m. on a weekday. After all, it isn't unnatural to think someone might be "at his place of abode . . . at 8:30 in the morning" when he's not working. *United States v. Woods*, 560 F.2d 660, 665 (5th Cir. 1977); *see also Valdez*, 172 F.3d at 1226 (discussing circumstances of employment as relevant to the inquiry).

Third, Mr. Denson had absconded and was hiding from law enforcement. That too made it incrementally more likely that he would be holed up at home rather than out and about. *See Valdez*, 172 F.3d at 1226 ("[O]fficers may take into account the fact that a person involved in criminal activity may be attempting to conceal his whereabouts.").

Fourth, the electric meter was whirring away. No one would expect a home's meter to remain inert on a wintry Wichita morning. But an officer at the scene said the "meter was going faster than normal" for the circumstances; another said it was "going crazy." These assessments are undisputed. Of course, an electric meter might be so busy only because the home uses electric heat rather than, say, gas or oil. But we have no facts hinting at such a possibility in this record. Neither does anyone dispute the common sense suggestion that, all things equal, electric meters tend to spin faster when people are present in a home using

electrical devices. *See id.* ("A suspect's presence may be suggested by . . . observing the operation of lights or other electrical devices.").

We're the first to admit that in isolation none of these facts may mean much. Even together they hardly prove a suspect is at home. But in combination we believe they are enough to establish probable cause (a fair probability) for such a conclusion. Neither does the non-precedential case Mr. Denson cites, *United States v. Chavez*, 561 F. App'x 730 (10th Cir. 2014), suggest otherwise. The *only* fact the officers could cite in that case for their belief that the defendant was inside the home at the time of the search was the time of the day. *Id.* at 733. That this fact in isolation is insufficient to give rise to probable cause in no way precludes our conclusion that probable cause is met in light of the confluence of facts present here.

While we lean on a certain combination of facts to supply the key to our decision, we pause to note a couple other facts on which we do not rely. The parties argue over whether the government can use fresh footprints officers saw in the snow around the home as further reason to think Mr. Denson could be found inside. In Mr. Denson's view, the government cannot rely on this evidence because the officers saw the footprints only after entering his home's backyard in violation of the Fourth Amendment. *See generally Florida v. Jardines*, 133 S. Ct. 1409 (2013). The government disagrees. But it isn't necessary to pursue the point because even without the footprints the probable cause standard is met;

neither does Mr. Denson argue that any of the facts we have relied on above involved an unlawful entry on his curtilage.

Separately and as we alluded to earlier, the government brought with it a Doppler radar device capable of detecting from outside the home the presence of "human breathing and movement within." All this packed into a hand-held unit "about 10 inches by 4 inches wide, 10 inches long." The government admits that it used the radar before entering — and that the device registered someone's presence inside. It's obvious to us and everyone else in this case that the government's warrantless use of such a powerful tool to search inside homes poses grave Fourth Amendment questions. New technologies bring with them not only new opportunities for law enforcement to catch criminals but also new risks for abuse and new ways to invade constitutional rights. *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 33-35 (2001) (holding that using warrantless thermal imaging to show activity inside a home violated the Fourth Amendment). Unlawful searches can give rise not only to civil claims but may require the suppression of evidence in criminal proceedings. We have little doubt that the radar device deployed here will soon generate many questions for this court and others along both of these axes. At the same time, in a criminal proceeding like ours the government is free to rely on facts gleaned independently from any Fourth Amendment violation. *See Murray v. United States*, 487 U.S. 533, 537 (1988). And in our case Mr. Denson acknowledges that all of the facts we've outlined

above were discovered independently of the potentially problematic radar search — a fact that requires us to defer those questions to another day.

Turning to the second issue presented, Mr. Denson argues that even if the officer's entry was lawful the search that turned up his guns was not. It is settled law, though, that officers lawfully entering a home to effect arrest can conduct "a quick and limited search of premises" — what's sometimes called a "protective sweep" — if they have reason to worry about someone lurking inside who could pose a danger to them or to others present. *Maryland v. Buie*, 494 U.S. 325, 327 (1990). And there is much to suggest this standard was met in our case. The officers knew Mr. Denson was a fugitive. They knew he had a history of violent crime. They knew he was a gang member and had violent associates. They knew, too, that a second person lived in the home who was wanted on an outstanding warrant. Collectively, all this supplied reason enough to worry that Mr. Denson might not be alone and that anyone else inside could be dangerous. *Cf. United States v. Murphy*, 516 F.3d 1117, 1120-21 (9th Cir. 2008) (upholding a protective sweep of a storage unit where officers hadn't accounted for the person who rented the unit, for whom an arrest warrant had issued), *abrogated on other grounds by Fernandez v. California*, 134 S. Ct. 1126 (2014).

But what — again — about the radar? Before the officers entered, their radar search suggested the presence of one person inside. And given that, one might well wonder: did the officers' questionable search outside the home

paradoxically negate their otherwise solid case for a search inside the home? Surely, after all, the government isn't entitled to perform searches to guard against phantom risks, ones they know don't exist. If radar (or any other investigative technique for that matter) dispels the possibility of a hidden danger, a search predicated on that possibility becomes constitutionally unreasonable. The government cannot take the benefit of a questionable radar search without having to live with its costs. *See Buie*, 494 U.S. at 335-36; *Walker v. City of Orem*, 451 F.3d 1139, 1150 (10th Cir. 2006). Neither does the government seek to justify its protective sweep in this case on the presence of any threat (say, traps or bombs) that its radar wasn't designed to detect. The government's only professed fear was the presence of persons, something its radar was admittedly designed to detect.

Even so, without more facts about the radar, its capacities and how it was used, we just can't say it "dispel[led]" the officers' "reasonable suspicion of danger" in this case. *Buie*, 494 U.S. at 335-36. We know the radar suggested the presence of someone inside. But how far inside the structure could it see? Could the device search the whole house and allow the officers to be sure that they had located every person present? Could it distinguish between one person and several? We just don't know. Our record lacks any answers. As a result, we simply aren't in a position to say that the radar search negated the officers' otherwise specific and articulable reasons to worry about a compatriot lurking

inside. We don't doubt for a moment that the rise of increasingly sophisticated and invasive search technologies will invite us to venture down this way again — and soon. *Cf. United States v. Jones*, 132 S. Ct. 945 (2012). We don't doubt that the use of such devices could well wind up undoing the justification for a good number of protective sweeps in the future. But we lack enough information to reach that result in this case.

That leaves Mr. Denson's final argument for reversal. In it, he accepts the premise that the officers' protective sweep legitimately led them to the guns but says that the decision to seize the weapons was still problematic. Problematic because the government usually may seize a private person's property without a warrant only if (among other things) "there [is] probable cause to believe it [is] contraband or evidence of a crime." *United States v. Thomas*, 372 F.3d 1173, 1178 (10th Cir. 2004). And, Mr. Denson argues, the officers searching his home lacked probable cause to think the guns they saw were either of those things.

We cannot agree. To be sure, guns are often possessed lawfully and as a matter of constitutional right. But not so with felons like Mr. Denson. In his case, the guns were indeed contraband. *See* 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Mr. Denson replies that, at least at the time of the search, the officers couldn't exclude the possibility the guns belonged (lawfully) to the home's second tenant rather than him. But a felon violates federal law not only by owning guns but also by actually or constructively possessing them. And a felon

- 10 -

constructively possesses guns if he "knowingly holds the power to exercise dominion or control over" them, even if the weapons formally belong to someone else. *United States v. Heckard*, 238 F.3d 1222, 1228 (10th Cir. 2001). In cases involving two individuals jointly sharing a home, this standard is satisfied when the defendant has "knowledge of and access to the weapon[s]" in question. *Id.* (quoting *United States v. Mills*, 29 F.3d 545, 550 (10th Cir. 1994)) (internal quotation mark omitted).

The officers coming upon the guns in our case had probable cause (a fair probability) to think that much about Mr. Denson. Mr. Denson listed himself with the utility company as the primary account holder for the residence. The closet in which the guns were found could be opened by anyone who wished access. It wasn't obscure or locked. Neither were the guns disabled in any way. Officers knew Mr. Denson was familiar with firearms and had used them unlawfully before, as his conviction for armed robbery attests. Given these facts, there's no serious question the guns were accessible to Mr. Denson and, while officers couldn't be metaphysically certain Mr. Denson knew of the guns, they had a good deal more than bare suspicion to support such a view.

Mr. Denson suggests our non-precedential decision in *United States v. Thompson*, 68 F. App'x 944 (10th Cir. 2003), compels a different conclusion but we don't see how. The constructive possession suspect there didn't even live in the searched house. And we don't doubt that it's a relatively heavy chore for the

government to show that a defendant had access to and knowledge of firearms hidden in someone else's house.  But no such difficulty is present here.  The home here was indubitably Mr. Denson's.  So, if anything, *Thompson* seems more instructive as a study in contrast with our case than as authority suggesting we should reconsider our course.

Affirmed.